AUGUSTUS P. LORING *vs.* BENJAMIN L. YOUNG & another.
JOHN L. BATES & others *vs.* AUGUSTUS P. LORING & others.

Suffolk.    April 25, 26, 1921. — August 8, 1921.

Present: RUGG, C.J., BRALEY, DE COURCY, CROSBY, PIERCE,
CARROLL, & JENNEY, JJ.

*Jurisdiction.    Supreme Judicial Court.    Mandamus.    Constitutional Law,*
Amendment of the Constitution, Rearrangement of the Constitution and
amendments, Opinion of the Justices.    *Evidence,* Competency.    *Words,*
" Rearrangement," " Rearranged," " Revision."

The question, whether the joint special committee of the General Court of 1920,.
appointed under a resolve authorizing and directing the committee to prepare
for the printers the revision of the General Laws of the Commonwealth and in
connection therewith to provide for the printing in the first volume thereof of
the Constitutions of the United States and of the Commonwealth, shall cause
to be printed as the Constitution of the Commonwealth the Constitution of 1780
with all the amendments thereto or the "Rearrangement of the Constitution,"
adopted and ratified by vote of the people at the State election on November 4,
1919, is justiciable; and, where it appears that the committee by a majority vote
has determined to print the Constitution of 1780 with all of the amendments
thereto and not the " Rearrangement," such question properly is brought before
the Supreme Judicial Court by a petition by citizens and taxpayers of the Com-
monwealth against all of the committee seeking a writ of mandamus directing
the respondents to print the "Rearrangement" as the Constitution, and by a
petition seeking the same remedy and brought by the minority member of the
committee against the majority members.

Opinions of the justices of this court, rendered "upon important questions of law,
and upon solemn occasions" under c. 3, art. 2 of the Constitution of the Com-
monwealth upon request of a branch of the Legislature or of the Governor and
Council, are advisory in character, are delivered by the justices as individuals
and not sitting as a court, and are formed without the aid of counsel or the benefit
of argument; and, when subsequently a matter upon which such an opinion has
been rendered comes before this court for determination by them as a court, the
justices are bound most sedulously to guard against any influence flowing from
their previous consideration of the question in their advisory capacity.

*Whether,* in proposing certain amendments to the Constitution to be voted upon by
the people in 1917, certain other amendments to be voted upon in 1918, and the
"Rearrangement of the Constitution" to be voted upon in 1919, the Constitu-
tional Convention, convened under the authority of St. 1916, c. 98, exceeded the
authority conferred upon it by § 6 of that statute, was a question not raised in these
proceedings and was not determined, it being assumed for the purposes of this
decision that the convention in this respect did not go outside its authority.

In determining, upon the petitions for the writ of mandamus above de-
scribed, whether the Constitution of 1780 and the amendments thereto
were superseded by the affirmative vote of the people at the State election on
November 4, 1919, in answer to the question, "Shall the Rearrangement of

the Constitution of the Commonwealth, submitted by the Constitutional Convention, be approved and ratified?" it is proper for this court to examine the debates, committee reports, proceedings and votes of the Constitutional Convention, not for the purpose of controlling the plain meaning of words written into the "Rearrangement" but for the purpose of understanding the conditions under which it came into existence and how it appears to have been received and understood by the convention. CROSBY, J., dissenting to so much of the foregoing decision as permitted the consideration of debates.

Testimony of various members of the Constitutional Convention of 1916–1919 as to matters not included in its publications and records, including their recollections and construction of events at meetings of committees and upon the convention floor, are not proper to consider in determining the meaning and effect of what was done by the convention as shown by its publications and records.

The words of the "Rearrangement of the Constitution" and of the vote at the State election in 1919 in which the people expressed their will are a manifestation of their desire concerning a constitution, and they are to be construed in the light of the conditions under which the "Rearrangement" was framed, the ends designed to be accomplished, the benefits expected to be conferred, and the evils hoped to be remedied.

When the will of the people, exercised under the right given them by art. 7 of the Declaration of Rights to reform, alter or totally change the government when their protection, safety, prosperity and happiness require it, has been ascertained, it must prevail.

In considering the question placed upon the ballot by the Constitutional Convention at the State election on November 4, 1919, " Shall the Rearrangement of the Constitution of the Commonwealth, submitted by the Constitutional Convention, be approved and ratified?" the natural conclusion for the voters to reach from either a cursory or the most complete examination of the pertinent facts was that, whether they voted "Yes" or "No," they in any event would continue to be living under precisely the same constitutional provisions and that no change in constitutional provisions would be effected by their vote. DE COURCY & CROSBY, JJ., dissenting.

A written constitution is the fundamental law for the government of a sovereign State, final in its statement of the rights, privileges and obligations of the citizens, ultimate in its grant of the powers, and conclusive in its definition of the limitations, of departments of State and of public offices.

A written constitution cannot be made subject in its "meaning or effect" to another instrument.

The voters, by their affirmative vote upon the question above described, expressed as their mandate in art. 157 of the " Rearrangement of the Constitution " that the " rearrangement shall not be deemed or taken to change the meaning or effect of any part of the Constitution or its amendments as theretofore existing or operative; " and that mandate can be given force and effect according to the natural meaning and effect of words as commonly used only by adhering to the Constitution of 1780 and its amendments as the fundamental law. DE COURCY & CROSBY, JJ., dissenting.

By the affirmative vote above described, the "Rearrangement" was not made the Constitution of the Commonwealth. DE COURCY & CROSBY, JJ., dissenting.

PETITION for a writ of mandamus, filed on February 7, 1921, by Augustus P. Loring, who, with Benjamin Loring Young and

Essex S. Abbott, comprised the joint special committee of the General Court of 1920 appointed under a resolve authorizing and directing the committee to prepare for the printers the revision of the General Laws of the Commonwealth and in connection therewith to provide for the printing in the first volume thereof of the Constitutions of the United States and of the Commonwealth, the petitioner alleging in substance " that the respondents [the members of the committee other than the petitioner], being a majority of said Committee acting upon the advisory opinion of the Justices of the Supreme Judicial Court in answer to a question propounded by the Governor and Council December 31, 1919 [reported in 233 Mass. 603], have voted to print in the first volume of the General Laws the Constitution of 1780 with the amendments thereto and no other as the State Constitution; that an instrument entitled ' A Constitution or Form of Government for the Commonwealth of Massachusetts' was unanimously adopted for submission to the people by the Constitutional Convention of the Commonwealth on August 12, 1919, and was duly and regularly adopted by the people on Tuesday, November 4, 1919, as the Constitution of the Commonwealth, and as such became part of the laws of the land;" that "such instrument by force of the provisions of the Convention Act of 1916, c. 98, and the proceedings thereunder and of its adoption by the people as aforesaid, and of its own provisions, and construed in the light of the proceedings and debates of the Convention and other competent facts and evidence, all of which your petitioner begs leave to bring to the attention of the Court, became and is the Constitution of the Commonwealth;" that "doubt has been raised whether the Constitution of 1780 with its amendments, or the Constitution so adopted by the people on November 4, 1919, is the State Constitution, and which of these instruments should be printed as the State Constitution in the first volume of the General Laws; that this question ought to be authoritatively determined in advance of printing the General Laws to which the Committee is now proceeding; and that the printing of any unauthorized instrument therein will involve the unlawful expenditure of public money, and will subject your petitioner and all other taxpayers in the Commonwealth to unwarranted and unlawful burdens, and will lead to confusion and uncertainty in the law and its admin-

istration, to the great loss and detriment of your petitioner and all other citizens of the Commonwealth." The prayer of the petitioner was " that the committee be required by writ of mandamus or other appropriate process to print in the first volume of the General Laws the ' Constitution and Form of Government' adopted by the people in the year 1919, or for such other action of the court in the premises as the case may require." Also, a

PETITION for a writ of mandamus, filed on March 8, 1921, and afterwards amended, by John L. Bates, Samuel W. McCall, James M. Morton, Henry T. Lummus, James F. Creed, George W. Anderson, Joseph Walker, Sherman L. Whipple, Francis P. Garland, Albert Bushnell Hart, Charles E. Hibbard, George R. Jones, Robert Luce, Samuel L. Powers, James P. Richardson, Albert H. Washburn and Albert E. Pillsbury, " all being citizens and taxpayers in the towns in which they reside, and residents and citizens of said Commonwealth, in behalf of themselves and of all other citizens in like interest," against all three of the members of the joint committee above described, containing allegations substantially the same as those in the petition above described, and a prayer " that the respondents be required by writ of mandamus or other appropriate process to print in the first volume of the General Laws aforesaid as and for the State Constitution, the aforesaid ' Constitution or Form of Government for the Commonwealth of Massachusetts' adopted by the people in the year 1919, and no other, and be restrained from printing as and for such constitution in said first volume of the General Laws the Constitution of 1780 with its amendments."

In both cases, the answer of the respondent Abbott admitted the allegations of the petition and stated, " that his action as set forth in said petition is taken solely because he deems himself to be bound by the advisory opinion of the Justices of the Supreme Judicial Court referred to in said petition," and that he submitted himself to the judgment of the court.

In both cases, the respondent Young in his answers alleged in substance " that the Constitution of the Commonwealth adopted in the year 1780 provided in chapter 6, article 11, that ' This form of government shall . . . be a part of the laws of the land and printed copies thereof shall be prefixed to the book containing the laws of this Commonwealth in all future editions of the

said laws,' and in accordance with this provision said Constitution and its subsequent amendments have been so prefixed hitherto; that the recent Constitutional Convention at its session in the summer of 1919 submitted to the people a document described as a rearrangement of the Constitution, to be voted upon, not as a new Constitution, but as a rearrangement of the existing Constitution at the state election held on November 4, 1919; that at the said election it appeared from the official tabulation of the Executive Council that the number of persons who voted was 532,483; that of this number 263,359 votes were cast in favor of the rearrangement and that 64,987 votes were cast in opposition to the rearrangement; and that from the tabulation of the votes thus cast upon the question the council reported that 'The said rearrangement appears to be ratified'; that thereafter at a meeting of the Governor and Council on December 31, 1919, an order was adopted reciting that a question had arisen as to the effect of this document thus voted upon and requesting an advisory opinion of the Justices of this Court on the question whether said document entitled ' The Rearrangement of the Constitution' is the 'Constitution or form of government for the Commonwealth of Massachusetts;' that thereupon the honorable Justices delivered an advisory opinion in answer to the foregoing question in which they all stated that ' In our opinion " The Rearrangement of the Constitution" described in the order of the Governor and Council is not " the Constitution or form of government for the Commonwealth of Massachusetts "'; that said document entitled 'the rearrangement' was not thereafter proclaimed by His Excellency the Governor as the Constitution of the Commonwealth; that after said advisory opinion was rendered a proposal was submitted to the General Court by the petitioner, [Loring] who was then a member of the Senate, as an alleged legislative amendment to the Constitution of the Commonwealth to substitute said document called 'the rearrangement' for the Constitution of 1780 and its amendments and said proposal was considered at a joint session of both Houses held on May 27, 1920, and, the yeas and nays being taken, the two Houses in joint session refused to order the amendment to a third reading, the vote being 23 yeas and 223 nays; that this respondent is informed and believes and therefore alleges that said document

is not merely a rearrangement, but contains substantial constitutional changes; that at the special session of the General Court which assembled December 7, 1920, two proposals to amend the Constitution of 1780 were proposed and were considered in joint session of both Houses held on December 21, 1920, and were agreed to respectively by votes of 208 to 0 and 195 to 3 and were referred to the next General Court, and the document thus recognized and amended by the General Court of 1920 as the Constitution of the Commonwealth was the Constitution of 1780 and its amendments, and not the document called 'the rearrangement;' that as above recited one co-ordinate department of the government, namely, the executive department, has been officially and constitutionally advised at its request by the opinion of all the Justices of this Court that the said document called 'the rearrangement' is not the Constitution of the Commonwealth; that the General Court as another co-ordinate department of the government has officially and formally by its action above recited expressly recognized the Constitution of 1780 and its amendments as the present Constitution of the Commonwealth and has thereby added its own opinion to that of the Justices of the Supreme Judicial Court that the rearrangement is not the Constitution of the Commonwealth; that this respondent as a member of the Joint Special Committee appointed under the Resolve referred to in the petition to prepare the General Laws of the Commonwealth for distribution and in connection therewith to print 'The federal and state constitutions in the first volume' thereof and as a member of the present General Court believes it to be his constitutional duty to prefix the Constitution of 1780 with its amendments to the General Laws in accordance with chapter VI, article XI, and not to print the rearrangement."

The two petitions came on to be heard before *Crosby*, J., upon an agreed statement of facts described in the opinion.

The Special Committee of the Constitutional Convention on Rearrangement of the Constitution, referred to therein, were as follows: President of the Convention John L. Bates, James M. Morton, Albert E. Pillsbury, Joseph Walker, Augustus P. Loring, Herbert Parker, Albert Bushnell Hart, Albert H. Washburn, John W. Cummings, Asa P. French, Charles E. Hibbard, Percy G. Bolster, James F. Creed, George R. Jones, Louis Swig, Frank

F. Dresser, James P. Richardson, Archie N. Frost, Francis P. Garland. Messrs. Morton, Pillsbury, Loring, Parker and Hart were the subcommittee referred to in the opinion.

The "proposed testimony of various members of the convention," referred to in the opinion, where it was decided that it could not "rightly be considered in determining the meaning and effect of what was done by the convention as shown in its publications and records" was stated in the agreed statement as follows:

" Mr. Morton [a petitioner], who drafted the report and memorandum, will testify, if competent, that the language used by him in the passage quoted from the report in the advisory opinion was used by him to make it plain that the Committee had not rewritten the old Constitution, as Professor Hart had done in document No. 4, but had rearranged its provisions as directed by the Convention, with such substantive perfecting changes as appeared necessary, and as are explained in the next paragraph of the report; and according to his understanding the language quoted in the advisory opinion from the 'memorandum' was used with the same purpose and no other (vol. IV, Debates, pp. 85, 86).

" He will testify further that the sentence in article 157 in the draft reported by the Committee beginning 'Such rearrangement' was inserted in its place as a rule of construction, in view of the transpositions and the verbal and other changes that had been made in the old Constitution, and with no understanding or intention that the rearrangement of the Constitution would not be the Constitution if ratified by the people; that according to his recollection Mr. Walker called the attention of the Committee to the ambiguity which he feared existed in article 157 as thus drawn, but the opinion was expressed that there was no ambiguity and that it was clear that the rearrangement of the Constitution would, if ratified by the people, be the Constitution, and he understood the Committee including Mr. Walker acquiesced in that view. Mr. Pillsbury and Mr. Garland [petitioners] will testify, if competent, to the same effect."

" Mr. Dresser will testify, if competent, that at the first meeting of the General Committee, at which the draft of the Sub-Committee was presented, he stated that in his opin-

ion the effect of article 159 as therein contained (which was printed in the advisory opinion of the Justices) would be to render the document presented, if adopted by the people, a new Constitution; that, if so, he feared that interweaving the many amendments with the original text and then re-enacting the whole might. so color the meaning of the provisions that prior interpretations of the original text and of the amendments would no longer be applicable; that it was therefore impossible to foresee what new interpretations might be placed upon hitherto well-understood provisions, and the risk of such far-reaching consequences was one which he was not willing to take; and that, if the draft of the Sub-Committee in its then existing form were to be adopted by the full Committee, he would feel compelled to dissent from the latter's report and take the question to the floor of the Convention."

" Mr. Parker will testify, if competent, that he never consented to any draft containing the word ' revision ' or to any phrase which he believed would permit an interpretation which would constitute the rearrangement as a substituted Constitution; that. Mr. Walker insisted that he expected and desired that the Convention through this proceeding should bring about a new or substituted Constitution. Mr. Pillsbury declared the language of the article produced this result and Mr. Parker maintained that it did not; that he expressed before the General Committee the same views that he expressed before the Convention; that he never agreed as a member of the Committee to any other view.

" The petitioner offers the testimony of Messrs. Morton and Hart, if competent, that while they heard what Mr. Parker said they were of opinion that the Convention as a whole were in favor of the rearranged Constitution, and of making it the Constitution of the Commonwealth in place of and as a substitute for the Constitution of 1780, and intended that it should be, if ratified by the people, which was their own position, and for this and other reasons they were content to leave the matter there without any further discussion either in regard to Mr. Parker's position or the scope and effect of the rearrangement of the Constitution; and the testimony of Mr. Pillsbury, if competent, that his attention was otherwise engaged and he did not hear Mr. Bryant's. question or Mr. Parker's answer, and never heard of the incident.

until the appearance of the Justices' opinion, and that he never
agreed with Mr. Parker's views as expressed in the Convention
and had never understood him to express that view in the Com-
mittee; and the testimony of Mr. Loring, if competent, that he
rose in his place to express the contrary opinion, that, if docu-
ment No. 2 was ratified by the people it would be the Constitu-
tion, but that there was much disorder in the Convention and he
was unable to get the floor."

By agreement of parties and counsel an order was made that the
petitions be heard together, and they were reported to the full
court for determination.

The case was argued at the bar in April, 1921, before *Rugg,*
C. J., *Braley, De Courcy, Pierce, & Jenney,* JJ., and afterwards
was submitted on briefs to all the Justices.

*J. M. Morton, A. E. Pillsbury, S. W. McCall, A. P. Loring,
F. P. Garland, L. Powers & J. Noble,* for the petitioners.

*F. W. Grinnell,* for the respondent, Benjamin Loring Young.

*E. H. Abbot, Jr.,* Assistant Attorney General, for the Common-
wealth.

*E. S. Abbott, pro se,* argued but did not submit a brief.

RUGG, C. J.   The General Court of 1920, by Res. c. 86, created
a joint special committee to provide amongst other matters for
the printing and distribution of the General Laws and "the print-
ing of the Federal and State Constitutions in the first volume"
thereof.

The parties have treated that committee as performing purely
ministerial functions, not partaking in any particular of those of
the legislative department.   The cases are considered on that
assumption.

The single question presented is whether that committee shall
print as the Constitution of the Commonwealth the Constitu-
tion of 1780 with the amendments, or the instrument prepared by
the Constitutional Convention convened pursuant to St. 1916,
c. 98, called "Rearrangement of the Constitution."

The decision, which of these two instruments is the Constitution,
affects the performance of the duties of that committee.   Those
duties are public in their nature.   The point is brought in issue in
regular form in these proceedings.   The cases are rightly before
us. *Attorney   General* v. *Suffolk County Apportionment Commis-*

*sioners,* 224 Mass. 598, and cases collected at page 610. *Sinclair* v. *Mayor of Fall River,* 198 Mass. 248, 256.

A justiciable question thus is presented. The convention owed its existence to a statute of the General ·Court approved by vote of the people. Its whole authority and commission was derived from that vote which in turn was founded upon and recognized the binding force of the statute. Upon general principles it had no authority to act in any other way or manner than as set forth in the statute. *Opinion of the Justices,* 6 Cush. 573, 575. The form of government of this Commonwealth as established by the people is a written Constitution. That instrument is the fundamental law of the people. To its terms the people themselves and every department of their government must conform. By that instrument the judicial department is charged with the obligation of exercising judicial powers and excluded from exercising executive or legislative functions, and the executive and legislative departments are with equal emphasis forbidden to exercise judicial powers. Art. 30 of the Declaration of Rights. Thus the people in their wisdom have delegated to the judicial department as their special guardians in this particular the duty of interpreting, applying, defending and preserving their creation. Whether that instrument has been changed or modified is a question of fundamental law. That is as thoroughly a question of law as the interpretation of the provisions of the Constitution. In both instances it is the ascertainment of the determination of the people as disclosed by written documents. To ·that all must yield. In order to interpret and apply the fundamental law, it is essential first to determine whether the original Constitution has been amended, altered, changed or superseded in whole or in part, and if in part, in what part. The judicial department cannot move in the performance of its duty without first settling that question. It cannot bound its own jurisdiction, determine the conflicting contentions of parties, or decide upon the rights, obligations and liberties of individuals until the Constitution which marks their definitions in broad outlines, fixes the nature and the limitations of the departments of government and declares its great objects, shall itself be ascertained. This is a government regulated by law under a written Constitution. The judicial department alone can decide what the law is. It is the only authoritative instru-

mentality to that end established by the Constitution. On principle there seems to us no distinction in this regard between an amendment or amendments to the Constitution and a rearrangement of existing constitutional provisions undertaken by peaceful methods under the forms of law and not by revolutionary proceedings. This is the consensus of opinion, so far as we are aware, of all courts which have had occasion to consider the question. It was said in *Ellingham* v. *Dye*, 178 Ind. 336, at page 391 (writ of error to which was dismissed in *Marshall* v. *Dye*, 231 U. S. 250), as the result and conclusion of an ample discussion: "And so the power resides in the courts, and they have, with practical uniformity, exercised the authority to determine the validity of proposal, submission or ratification of change in the organic law." This statement is supported by citations of decisions from twenty-three other States of the Union. We do not need to review or recite them. Since that decision the question has arisen and been settled in the same way in at least two other States. *McCreary* v. *Speer*, 156 Ky. 783. *Foley* v. *Democratic Parish Committee of Parish of Orleans*, 138 La. 220. *State* v. *American Sugar Refining Co.* 137 La. 407. See also, for review of authorities, *McConaughy* v. *Secretary of State*, 106 Minn. 392, 401, 402; *Bott* v. *Secretary of State*, 34 Vroom, 289; and *Koehler & Lange* v. *Hill*, 60 Iowa, 543. See also, to same point, *Scott* v. *Secretary of State*, 202 Mich. 629, 644; *State* v. *Marcus*, 160 Wis. 354, 358, 359; *Crawford* v. *Gilchrist*, 64 Fla. 41, decided later than *Ellingham* v. *Dye*. The same question in its essence has come before the Supreme Court of the United States. In the *National Prohibition Cases*, 253 U. S. 350, it was argued strenuously by counsel of the highest eminence that the Eighteenth Amendment to the Federal Constitution was beyond the power of amendment reserved in Article 5 of that instrument and was not a part of the fundamental law. The court entertained those questions and decided them at page 387. That decision, if followed, is conclusive of that point in the case at bar. In principle there can be no distinction between deciding upon the validity and regularity of an amendment and of a constitution newly formed in substitution for an earlier one.

There is nothing inconsistent with this view in *Luther* v. *Borden*, 7 How. 1. It there was held that under the Federal Constitution the Supreme Court of the United States did not have jurisdiction

to decide which of two instruments was the valid Constitution of a State on the ground that that was by the terms of the Constitution of the United States a political question to be settled by the Congress and not by the courts of the United States. It also there was said in substance that no court can declare invalid the government they serve or that the Constitution which they have sworn to protect is a nullity. This principle controlled the decision in *Carpenter* v. *Cornish*, 54 Vroom, 696, *Brittle* v. *People*, 2 Neb. 198, and *Miller* v. *Johnson*, 92 Ky. 589. Without impugning that principle, it seems to us not applicable to the facts here presented. As between the partizans of rival forms of government arrayed against each other in armed conflict, as was the case in Dorr's rebellion involved in *Luther* v. *Borden*, 7 How. 1, which is the established and which the revolutionary, may under appropriate circumstances be a political question. Other questions may arise concerning constitutions political rather than judicial in their nature, or where it may be difficult to distinguish between them.

It has been strongly argued by one of the petitioners that this is a political question. If it be held that the question raised on this record is a political one, that would be decisive against the petitioners. The court could not decide it. Moreover, it is apparent from the agreed facts that the executive and legislative departments of government have continued to recognize the Constitution of 1780 and its amendments as the fundamental law subsequent to the ascertainment of the vote upon the rearrangement at the election in November, 1919. The General Court at its regular session of 1920 adopted a proposed amendment to Article 48 of the Amendments to the Constitution and referred the same to the next General Court. Senate Journal of 1920, page 873. See, also, Senate Journal Extra Session 1920, pages 78–86. The Justices of the Supreme Judicial Court as individuals may be required to express an opinion upon a constitutional question even though the question proposed be of such nature that it could not " come before them in their judicial capacity." *Opinion of the Justices*, 126 Mass. 557, 566. The executive department doubtless has followed the *Opinion of the Justices* in 233 Mass. 603. To treat this solely as a political question would dispose of the controversy by requiring the dismissal of the peti-

tions. In effect it would result adversely to the rearrangement and in favor of the Constitution of 1780 and its amendments. However, that the question here presented is justiciable is manifest both on reason and on the great, if not the universal, weight of authority.

The inquiry, which of these two instruments, — that is, the Constitution of 1780 with its amendments, or the Rearrangement of the Constitution, — is the Constitution of the Commonwealth, was considered in an opinion reported in 233 Mass. 603, rendered to the Governor and Council by the Justices of the Supreme Judicial Court in the discharge of the constitutional requirement in c. 3, art. 2, to give such opinions on request "upon important questions of law, and upon solemn occasions." That opinion, like all others given under that constitutional mandate, was advisory in character, was delivered by the Justices as individuals and not sitting as a court, and was formed without the aid of counsel or the benefit of argument. At that time the fourth volume of the debates of the convention pertaining to this subject was not issued, it not having been published until January of the current year, and we were able to examine only a part of it in galley proof. It often has been decided that an opinion formed and expressed under such circumstances is liable to incorrectness and must be regarded, not as conclusive and binding, but open to reconsideration and revision; yet it imports a view resting upon judicial consideration and examination of the subject. When called to decide the same matter coming before them as a court, the Justices are bound most sedulously to guard against any influence flowing from their previous consideration in their advisory capacity. *Young* v. *Duncan*, 218 Mass. 346, 351, and cases there collected. *Perkins* v. *Westwood*, 226 Mass. 268, 272, and cases collected.

No one contends that, prior to the November election of 1919, the Constitution of 1780 and its amendments was not the Constitution of the Commonwealth. The point to be decided is whether that has been supplanted by the rearrangement.

In a broad sense the decision of the cases at bar turns upon the powers of the Constitutional Convention convened under St. 1916, c. 98, upon the action taken by that convention, and upon the vote of the people concerning that action. It depends in a strict

sense ultimately upon the meaning and effect of Article 157 of the Rearrangement of the Constitution as adopted by the convention. That article declares the scope and effect of the rearrangement. It is in these words: " Upon the ratification and adoption by the people of this rearrangement of the existing constitution and the amendments thereto, the constitution shall be deemed and taken to be so rearranged and shall appear in such rearranged form in all future publications thereof. Such rearrangement shall not be deemed or taken to change the meaning or effect of any part of the constitution or its amendments as theretofore existing or operative."

The statute under which the convention was called into being, St. 1916, c. 98, authorized it in § 6 to " take into consideration the propriety and expediency of revising the present Constitution of the Commonwealth, or making alterations or amendments thereof. Any such revision, alterations or amendments, when made and adopted by the said convention, shall be submitted to the people for their ratification and adoption, in such manner as the convention shall direct; and if ratified and adopted by the people in the manner directed by the convention, the Constitution shall be deemed and taken to be revised, altered or amended accordingly; and if not so ratified and adopted the present Constitution shall be and remain the Constitution of the Commonwealth." The question has not been raised whether the convention exceeded its powers in proposing to the vote of the people amendments in two different years and the Rearrangement of the Constitution in a third year. That point is not considered. It is assumed for the purposes of this decision that it did not in this respect go outside its authority.

The convention met in 1917 and after sitting many days proposed three amendments for vote at the November election of that year, which were ratified and adopted as amendments 45, 46 and 47. It also proposed at that session another amendment to be voted upon at the next election. It reassembled in 1918 and sat many days. Nineteen amendments in all were proposed to be voted upon at the November election of 1918 and all were adopted and ratified, being amendments numbered 48 to 66, both inclusive. Near the end of the session held in 1918 the convention adopted an order for the appointment of a special committee of " Re-

arrangement of the Constitution," whose duty was "after the submission to the people of all the amendments proposed by the Convention " to "arrange the Constitution, as amended, under appropriate titles and in proper parts, chapters, sections and articles, omitting all sections, articles, clauses and words not in force and making no substantive changes in the provisions thereof." The speech of Mr. Washburn, the member of the committee apparently charged with the duty of presenting and supporting the order, dwelt upon the importance of its adoption in order that the Constitution might be free from the parts repealed or no longer operative because of modifying amendments.

The president of the convention at the close of its sittings in 1918 made a speech, seven hundred thousand copies of which were ordered printed and distributed to the voters together with the pamphlet containing the various amendments proposed by the convention for vote at the election of 1918. In that address occurs this passage (Vol. 4 of Debates, at page 425): "It has seemed to the Convention that its work could not be complete until it had submitted to the people a revised draft of the Constitution that should incorporate therein all the amendments, nearly fifty in number, adopted since the original Constitution of 1780. It is obvious that such a revision would be of slight value if it did not include also such amendments now submitted as the people may adopt at the coming election. The Convention therefore has provided for a special committee to meet after the results of the voting in November are known. This committee is to prepare a draft of a revised Constitution, incorporating therein all the amendments that shall have been adopted then, and this draft is to be submitted to the Convention next summer. It is believed that the convention can pass upon it then without delay and provide for its submission to the people at the following election, and having so done the Convention will adjourn *sine die*, satisfied that, to the best of its ability, it has discharged faithfully and completely the great trust reposed in it. While our labors are not therefore over, they are ended for the present, and our future assembling will be for but a brief period and for a specific object."

The convention then voted to adjourn subject to the call of its president or secretary, not later however than within twenty days after the prorogation of the General Court of 1919, "for the

purpose of taking action on the report," that is, the report of the special committee on rearrangement.

A committee of nineteen on rearrangement of the Constitution was appointed and from its members a sub-committee of five was selected to prepare the rearrangement.

The sub-committee made a report in print of a proposed rearrangement of the Constitution to the committee of nineteen in May, 1919, copy of which was submitted to the court at the argument and reference to which was made in the *Opinion of the Justices*, 233 Mass. 603, at page 605. Article 159 of that draft corresponded to Article 157 as adopted by the convention and was in these words: "Upon the ratification and adoption of this constitution by the people, the constitution heretofore existing, with all amendments thereto, shall be deemed and taken to be revised, altered, or amended accordingly. All laws not inconsistent with this constitution, and all rights, remedies, duties, obligations, and penalties, which exist and are in force when this constitution is ratified and adopted, shall continue to exist and be in force as heretofore until otherwise provided." The committee also had before it the following draft for the same section: "Upon the ratification and adoption by the people of this revision of the constitution, the constitution heretofore existing with all amendments thereto, shall be deemed and taken to be so revised, altered, and amended. All laws, rights, remedies, duties, obligations, and penalties which exist and are in force when the constitution as so amended is ratified and adopted shall continue to exist and be in force as heretofore until otherwise adjudged or provided." It had before it other forms which are not now available. It is clear that, if either of these forms had been inserted in the rearrangement instead of Article 157 and the rearrangement had been validly adopted as a part of the fundamental law, then the old Constitution and its amendments would have been entirely superseded and the rearrangement would have become the Constitution. The significant fact is that the special committee on rearrangement, having before it two forms of an article in unmistakable words declaring the old Constitution at an end and that a new one was taking its place, did not adopt either of those forms but framed, contrary to the report of its sub-committee, the wholly different Article 157. The special committee on rearrangement of the

Constitution reported on August 12, 1919. In its report, after quoting the order for its appointment, occur these words (Vol. 4 of Debates, pages 3 and 4): " Document No. 1 accompanying this report is a reprint of the Constitution with all amendments, made only for the convenience of the committee and the Convention. Document No. 3 shows the omissions and transpositions as required by the order of the Convention. The object of the order was, as the committee understands it, to have the existing Constitution and its amendments, sixty-six in all, brought together in one body, omitting all ' sections, articles, clauses and words' which by the lapse of time, or by repeal, or annulment, or otherwise, have ceased to be in force, and making such rearrangement, with the changes in phraseology and punctuation necessarily involved, as would form a consistent and connected whole. The committee are of opinion that it manifestly was not intended that they should draft a new Constitution embodying the existing Constitution and amendments, and they have not attempted to do so. They have considered that their duty in that regard was confined to one of rearrangement. The committee have construed the order to mean that it was the will and purpose of the Convention that no change in the existing Constitution and its amendments should be made by the committee which would or might in any way affect their meaning or present construction, or the construction which has heretofore been given to the provisions thereof, and they have carefully refrained from making any change which, it seemed to them, would or might have that effect. Where there was an obvious omission, or a manifest ambiguity, as there seems to have been in a few cases, or where a change in phraseology or punctuation was rendered necessary by the rearrangement, or by the omission of words, phrases or articles, and when it was clear that another word or phrase should be substituted for the one used, to secure consistency, or uniformity in language, the committee deemed that it came within the scope of their duty to supply such omissions or remove such ambiguity or make such changes, and they have done so. The textual changes so made have been comparatively few. The committee have transposed articles and provisions where such transposition seemed to them to effect a better and more logical arrangement. In no instance was any change of meaning or substance intended by, nor has any

as the committee believe resulted from, such transposition. . . . While the report is substantially unanimous, it is proper .to say that some differences of opinion exist in the committee. It should be noted, however, that in only one instance is there any difference of opinion as to what has been omitted as no longer in force. Such other differences as there are relate mainly to matters of arrangement." At the same time the committee on rearrangement submitted a "memorandum" showing "in detail changes made by the proposed rearrangement in the existing Constitution and amendments." It is printed in Vol. 4 of the Debates, pages 65 to 73. Its comments fully support the statement of the report of the committee to the effect that it was their purpose to effectuate exactly, with the utmost scrupulousness, the will and intention of the convention, as expressed in substance in the order creating the committee, that "no change in the existing Constitution and its amendments should be made by the committee which would or might in any way affect their meaning or present construction, or the construction which has heretofore been given to the provisions thereof, and they have carefully refrained from making any change which, it seemed to them, would or might have that effect."

There are two aspects of the debate in the convention upon this report which are or may be of consequence.

(A) Mr. Morton, who presented the report of the committee on rearrangement, moved that the rearrangement of the Constitution be amended by inserting as Article 143 these words: "All causes of marriage, divorce, and alimony, and all appeals from the judges of probate, shall be heard and determined by the Governor and Council until the Legislature shall, by law, make other provision." It appears from the debate on this motion that these words constituting c. 3, art. 5 of the Constitution of 1780 had been omitted by the committee from the rearranged Constitution, because a majority of that committee felt that they were not in force and were not necessary. The position taken in debate by Mr. Morton was that the words constituted an operative article, still in force, which should remain in the Constitution. His motion was adopted by the convention. Vol. 4 of Debates, pages 74 to 80.

(B) After the adoption of this amendment, but while the report of the committee of nineteen on Rearrangement of the Con-

stitution was under consideration, Mr. Bryant, who had not been a member of the committee on rearrangement, addressed the convention. He said: "I am a great deal puzzled, possibly I am the only one who is puzzled, about the meaning of Article 156 on page 77." After reading that article, now Article 157, he proceeded: "I do not rise to speak in opposition in any way to the report of the committee, which seems to have been prepared very carefully, and to have involved a very large amount of labor. But after we have adopted this, and after the people have voted on it, what is going to be the Constitution of Massachusetts? Where are we going to find it? Is it in this document? The remarks of the gentleman from Fall River (Mr. Morton) have brought before us very strikingly the difficulty that is going to exist. For example, he has suggested to us an amendment as to a matter of substance, that has been omitted by the committee. It was an important matter, in his opinion, and in the opinion of the Convention, as they gave evidence by adopting his amendment.

"Now, assume for a moment that his amendment had not been adopted by the Convention, but that this document had been adopted by the people, and suppose somebody had written to you from New York and asked you to send them a copy of the Constitution of Massachusetts. What would you have sent them? Would you have sent them this document? . . . So that I ask again, and I hope the question will be answered for the purpose of the record, at least, after the people have adopted. this, where shall we find the Constitution of Massachusetts?" Mr. Parker, a member of the committee on rearrangement and of its sub-committee of five, answered as follows: "To answer most briefly the latter portion of the inquiry of the gentleman from Milton (Mr. Bryant), I should say to him that no one would attempt, as we conceive the significance of this new instrument, to construe it as the Constitution of this Commonwealth without comparing the original text of the Constitution and amendments with the rearranged text. For the purpose of determining such construction the documents must be examined in comparison one with the other. It is not, as we conceive it, a substituted Constitution; it is a rearranged Constitution, preserving in its phrase all the provisions which are believed to be now operative. If some that are now operative be not found in the new text they are still existing as

the cardinal law of the Commonwealth. To determine what is the constitutional law of Massachusetts it would be necessary for the careful investigator whose opinion was sought as to what was the existing constitutional provision, to examine both the rearranged Constitution, which is primarily for the convenience of the observer or whoever cares to examine it to determine its provisions, but for its construction it must be read in association with all the existing texts, both of original Constitution and of amendments." The other members of the committee of five and several, if not all the other, members of the committee of nineteen on rearrangement, were present in the convention but none of them answered the question of Mr. Bryant, and the debate upon that matter closed without further comment on the inquiry or the reply. Vol. 4 of Debates, pages 83 to 86.

These proceedings of the convention were public, they challenged the attention of a considerable portion of the people, and they were reported to a greater or less extent in the daily press. They constitute a part of the history of the convention and the circumstances under which the Rearrangement of the Constitution was submitted to popular vote. They may be examined, not for the purpose of controlling the plain meaning of words written into the Rearrangement of the Constitution but of understanding the conditions under which it came into existence and how it appears then to have been received and understood by the convention. To do this is no more than has been done in many instances. *Opinion of the Justices,* 126 Mass. 557, 561, 591–598. *Legal Tender Case,* 110 U. S. 421, 443. *United States* v. *Wong Kim Ark,* 169 U. S. 649, 697-699. *Old South Association* v. *Boston,* 212 Mass. 299. See *Legal Tender Cases,* 12 Wall. 457, 652–656. We do not understand this practice of the courts to be narrowed by *United States* v. *Trans-Missouri Freight Association,* 166 U. S. 290, 317, 318, *United States* v. *St. Paul, Minneapolis & Manitoba Railway,* 247 U. S. 310, 318, *Duplex Printing Press Co.* v. *Deering,* 254 U. S. 443, 474, 475.

Proffered testimony of various members of the convention, which is set forth in the agreed facts, we think cannot rightly be considered in determining the meaning and effect of what was done by the convention as shown in its publications and records.

When the rearrangement is examined in comparison with the

Constitution of 1780 and its amendments, it is manifest that numerous changes of form were made in the rearrangement. In many instances, doubtless in all, so far as possible in carrying out the design of the rearrangement, the words of the Constitution of 1780 and its amendments were used. The rearrangement consists of a preamble and one hundred and fifty-eight articles, classified by subjects and numbered consecutively. It differs in arrangement from the Constitution of 1780 and its amendments.

It is clear that there was no purpose or intention on the part of the committee on rearrangement or any of its members that there should be any change of substance in the rearrangement as compared with the Constitution of 1780 and its amendments. That was the plain purport, both of the order creating the special committee on rearrangement and of the report of that committee. It seems equally plain that that was the intent of the convention.

Subsequent discussion, argument and examination have revealed several which seem to us changes of substance in the Rearrangement of the Constitution as compared with the Constitution of 1780 and its amendments.

(1) In the Constitution of 1780, by c. 2, § 1, art. 3, c. 2, § 2, art. 1, c. 2, § 3, art. 2, as amended by Articles 16 and 25 of the Amendments, provision was made for the election of the Governor, Lieutenant Governor and Councillors by the House of Representatives and the Senate, in case of failure by the people to elect those officers or any of them. Although by c. 2, § 3, art. 7, it was provided in effect that the elections to be made by the two houses of the Legislature should be held on the last Wednesday in May annually and by adjournment until completed, yet when by Article 10 of the Amendments the beginning of the political year was changed from the last Wednesday of May to the first Wednesday of January, the General Court was directed to proceed "at that session, to make all the elections . . . which are by the constitution required to be made. . . ." Thus no definite date was fixed for the holding of the elections. In the Rearrangement of the Constitution by Articles 40, 118, 128, 132, express provision is made that such elections shall be held on the first Wednesday in January, and if not completed on that day, by adjournment from day to day until completed.

(2) By the Constitution of 1780 and its amendments, by the

articles to which reference has just been made in the preceding paragraph (1), no order of precedence was established for the elections of the several officers. By Article 40 of the Rearrangement of the Constitution it is required that vacancy in the office of Governor first shall be filled, then that in the office of Lieutenant Governor, and finally vacancies in the council.

(3) It was provided by Article 64 of the Amendments that the terms of office of senators and representatives "shall begin with the first Wednesday in January succeeding their election and shall extend to the first Wednesday in January in the third year following their election and until their successors are chosen and qualified." By that amendment, in addition to biennial in place of annual elections, a further change had been made in Article 10 of the Amendments wherein it had been declared that the General Court should be " dissolved on the day next preceding the first Wednesday of January." The last eight words of Article 64 of the Amendments namely, " and until their successors are chosen and qualified," are omitted in Article 39 of the Rearrangement of the Constitution, so that the terms of office of senators and representatives would expire in any event on the day preceding the day fixed for the convening of a newly elected General Court.

(4) It was provided by Articles 21 and 22 of the Amendments, as interpreted by an *Opinion of the Justices* to the House of Representatives, 220 Mass. 609, that, although the census for the year 1857 must be taken on the first day of May and returned on or before the last day of June, the time of taking and returning the census in the year 1865 and every tenth year thereafter might be fixed by the Legislature. By Article 44 of the Rearrangement of the Constitution, it is provided in explicit words that " A census of the inhabitants of each city and town, on the first day of May, shall be taken and returned into the office of the secretary of the commonwealth on or before the last day of June, in the year one thousand nine hundred and twenty-five; and every tenth year thereafter. . . ." This manifestly makes a change, at least for the year 1925.

(5) Confessedly Article 157 is a new article. It is said in the "memorandum" concerning that article in the rearrangement, which was Article 156 in the report, Vol. 4 of Debates, 73: " This is a new division and title. It adopts in part the language of

the act for calling and holding the convention (St. 1916, c. 98), and is introduced to show that the proposed draft, if adopted, is to be regarded as a continuation of the existing Constitution and amendments so far as the provisions thereof are in force, and that no substantive change in the present meaning and construction or that which has been heretofore given to them is intended." An examination of the memorandum shows that by careful consideration of what is there said concerning the reframed articles and by comparison with the Constitution and its amendments, these substantial changes might have been discovered. They escaped the observation of the Justices in giving the opinion reported in 233 Mass. 603. There is nothing to indicate that they attracted the attention of any member of the convention until long after it had adjourned without day. It is the fair inference from the debates that the report of the committee on rearrangement with its accompanying documents was not distributed to the members until a day or two before the convention assembled in 1919 and did not reach some, probably many, of them until it actually met. So far as has been suggested in argument, or so far as we are aware, these changes of substance were not matter of discussion and were not discovered until after the November election of 1919.

The extent or character of these changes is not now material. It need only be noted that they are changes of substance and not merely a rearrangement of the same matter previously a part of the fundamental law but placed in a different order. The other changes, to which reference is made in the agreed facts, do not seem to us at this moment to be changes of substance. No other changes of substance in the Rearrangement of the Constitution have come to our attention, but we cannot assert with confidence that there are not others.

The convention was in session only two hours on the day when this report was received and adopted, and the debate occupies only fourteen pages in its records. Vol. 4 of Debates, pages 73 to 87. In 1917 the convention sat eighty-one days, and in 1918 thirty-six days, and in 1919 two days.

The convention did not provide that, in the event of an affirmative vote of the people on the rearrangement, there should be proclamation by the Governor of its adoption. The same con-

vention made express order for such proclamation both in 1917 and in 1918, concerning the adoption of the amendments then submitted to popular vote.

The rearrangement was submitted to the vote of the people at the November election, 1919, the vote being two hundred sixty-three thousand three hundred fifty-nine in favor, and sixty-four thousand nine hundred seventy-eight in opposition. Although the supporting vote was a minority of the total of five hundred thirty-two thousand four hundred eighty-three votes cast at the election, it was " a majority of the qualified voters voting thereon," and hence a compliance with the order of the convention and St. 1916, c. 98, § 6. Vol. 4 of Debates, pages 86, 87.

It is in the light of this history that the act of the people at the election of 1919 is to be interpreted.

There are three possible constructions. (1) That the rearrangement is itself the Constitution in complete entity. (2) That the rearrangement imports into its body by reference the Constitution of 1780 and all its amendments, and that together these constitute the frame of government, the rearrangement to be followed except in those instances where it may conflict in substance with the Constitution of 1780 and its amendments. (3) That the Constitution of 1780 and its amendments is still the fundamental law.

The words of the rearrangement and of the vote respecting it, in which the people expressed their will, are a manifestation of their desire concerning a constitution. They are to be construed in the light of the conditions under which it was framed, the ends designed to be accomplished, the benefits expected to be conferred, and the evils hoped to be remedied. In such connection words naturally are employed in a plain sense as expressing general ideas. Simple and dignified diction has characterized our Constitution and most of its amendments rather than technical and narrow definition. Terse statement of governmental principles in clear language is to be expected rather than the niceties of fine distinctions in the use of words inviting controversy as to their significance. The vote and the Rearrangement of the Constitution are to " be interpreted in a sense most obvious to the common understanding at the time," because they were proposed for public consideration and ought to be understood by all entitled to vote.

*Bishop* v. *State*, 149 Ind. 223, 230. *Attorney General* v. *Methuen*, 236 Mass. 564, 573, and cases there collected. Sovereignty in this Commonwealth resides in the people. "The people alone have an incontestable, unalienable and indefeasible right to institute government; and to reform, alter, or totally change the same, when their protection, safety, prosperity, and happiness require it." Art. 7 of the Declaration of Rights. When their will in this regard, manifest according to forms which ought to be observed, has been ascertained, it must prevail. This is the rule to govern our decision. Its correct application is the crucial point for decision.

What would the voters as men of common sense and average intelligence naturally think they were doing, when called upon to cast their ballots on the question submitted to them? That question was: "Shall the Rearrangement of the Constitution of the Commonwealth, submitted by the Constitutional Convention, be approved and ratified?" On reading the instrument itself, copy of which was sent to each voter, they would find what was in general appearance a complete form of government; but they would also find, in next to the last paragraph, Article 157 already quoted. They would see, that the dominating words of that article are "rearrangement" or "rearranged." If they understood those words as they are commonly used in the speech of plain people, they would believe that the instrument was simply a change in the position of the provisions of the old Constitution and its amendments, but no change of their substance. If they studied Article 157 with the skill of one learned in the use of words, they would reach the same conclusion. If they looked at St. 1916, c. 98, § 6, by the acceptance of which they had authorized the convention, they would see that there was no such word in it as "rearrange" or "rearrangement," but only "revising . . . making alterations or amendments," "revision, alterations, or amendments," and "revised, altered or amended," words of a different signification from "rearrange" or "rearrangement." Whether the voters interpreted the words according to common understanding or according to definitions of lexicographers, they would fail to find any ground for treating "rearrangement" as meaning the same as "revision," or as the equivalent of "making alterations or amendments." If they had examined the report

to the Convention of the Committee on Rearrangement, they would have found explicit statement to the effect that the instrument was not a new draft embodying the provisions of the old Constitution and its amendments, but merely a rearrangement of existing provisions without substantial change. If the voters had gone further and read the convention documents and debates, this impression would have been confirmed. They there would have read that the convention appointed a committee expressly charged with the single duty of rearranging the existing Constitution without change in substance, that that committee reported to the convention that the draft submitted by them was simply a rearrangement without substantial change and that the convention restored to the draft an omitted provision, to the end that there might be no change in the rearrangement. The natural conclusion for the voters to reach would be that, whether they voted " yes " or " no " to the question on the ballot, they would in any event continue to be living under precisely the same constitutional provisions and that no change would be made. The conclusion would be the same whether the voters made only a cursory or the most complete examination of the pertinent facts. Even though some change of substance had been made through inadvertence, the voters on reading Article 157 would draw the conclusion that they might rest secure in the confidence that the old Constitution and its amendments could not be taken to be changed in any part as to its meaning and effect, and that it would stand as amended as the fundamental law. The voters would also know that if mistakes had occurred in the making of the rearrangement so that changes of substance had been introduced in the rearrangement as compared with the Constitution of 1780 and its amendments, it would be the duty of the judicial department to protect their purpose that there be no such change, a purpose expressed in Article 157. This meaning seems to us the one likely to be attributed by the voters to the act of voting upon the rearrangement. It is the one which we feel ought to be given as matter of judicial decision.

We are not unmindful of the strength of the arguments presented by the able counsel who have appeared in earnest support of the proposition that the Rearrangement is the Constitution and that it has superseded and taken the place of the Constitution of 1780 and its amendments. We have given them full and careful con-

sideration. Some of these arguments support the second possible construction just suggested. But we cannot escape the conclusion that the Constitution of 1780 and its amendments are the fundamental law. The reasoning and in the main the words of the advisory opinion are adopted as the ground for this judgment.

The first sentence of Article 157 is in these words: " Upon the ratification and adoption by the people of this rearrangement of the existing constitution and the amendments thereto, the constitution shall be deemed and taken to be so rearranged and shall appear in such rearranged form in all future publications thereof." The words "rearrangement" and "rearranged" do not express revision, codification or the establishment of something new. They are inapt to describe a finality. Nevertheless, if the first clause of this sentence stood alone there would be strong implication as matter of construction that "this rearrangement of the existing constitution and the amendments thereto " when validly adopted by the people, would be the Constitution. The shadow thrown upon that construction by the words "rearrangement" and "rearranged " is deepened by the concluding clause, namely, " and shall appear in such rearranged form in all future publications thereof." This clause would be wholly superfluous if "this rearrangement" were itself to be the Constitution. If the rearrangement were to be the Constitution, it would not be a "rearranged form:" it would be itself the entire substance and not a "form," rearranged or otherwise. Moreover, if the rearrangement were the Constitution, manifestly it alone could appear "in all future publications thereof." No other document or instrument could be thought or deemed to be the Constitution, or susceptible of being published as such. Declaration to that end would be vain, especially in view of the provisions of the following Article 158. The last word of the first sentence, namely, "thereof," under these circumstances seems to refer to the words "the existing constitution and the amendments thereto." The second sentence of Article 157 is in these words: " Such rearrangement shall not be deemed or taken to change the meaning or effect of any part of the constitution or its amendments as theretofore existing or operative." That sentence is something different from the formulation of a mere rule of construction. A rule of that nature is at hand in the simple words usually found in general

revisions of statutes to the effect that their provisions "so far as they are the same as those of existing statutes, shall be construed as a continuation thereof." R. L. c. 226, § 2 (see now G. L. c. 281, § 2). Such a rule of construction recognizes the new as controlling. The second sentence of Article 157 is widely at variance with the thought thus embodied. This sentence signifies that the old Constitution and its amendments shall not be changed in meaning or effect in any part by the rearrangement. The words of this sentence cannot be given force according to the common and approved usage of the language except by holding that in case of any conflict between the provisions of the rearrangement and the Constitution with its amendments, the latter must prevail and those of the rearrangement must yield. It would seem that no change was intended by the rearrangement. But the deeper question is, in instances of substantial change, which governs? The second sentence of Article 157 seems to us to declare that in such case "the constitution" of 1780 with "its amendments" shall stand in preference to the "rearrangement." That interpretation is not affected by the concluding words of the sentence "as theretofore existing or operative." Whether these are taken as modifying the words "meaning or effect" or the words "constitution or its amendments" they do not shake or obscure the dominant thought expressed by the sentence. That dominant thought is the continued primacy of "the constitution" and "its amendments" notwithstanding anything contained in the "rearrangement." It is unthinkable that it was intended that there should be at one and the same time two different and separate constitutions. That would be a contradiction of terms. Either the Rearrangement or the Constitution of 1780 with its amendments must be the Constitution. They cannot both be concurrently effective as Constitutions. A written constitution is the fundamental law for the government of a sovereign State. It is the final statement of the rights, privileges and obligations of the citizens and the ultimate grant of the powers and the conclusive definition of the limitations of the departments of State and of public officers. In its grants of powers, the bounds set for their exercise, the duties enforced and the guarantees established are found the constitutional liberty of the individual and the foundation for the regulated order and general welfare of the community.

To its provisions the conduct of all governmental affairs must conform. From its terms there is no appeal. Such a great charter cannot itself in the nature of things be made subject in its "meaning or effect" to another instrument. In that event it is not final and that other instrument becomes paramount. Article 157 in its entirety is language apparently not designed to declare the rearrangement as the final law. Its meaning and effect are by the express words of that article made dependent upon the terms of the Constitution and its amendments. Therefore the rearrangement cannot be itself the fundamental law. It is a rearrangement of the old, it is not the creation of a new form of government.

This conclusion is re-enforced by the facts now disclosed of the existence of substantial changes in the Rearrangement as compared with the Constitution of 1780 and its amendments. We are not aware and we have not been informed and it has not been intimated in argument or otherwise in this proceeding that these changes of substance were discovered or made public until after the advisory opinion in 233 Mass. 603. The rearrangement was submitted to the people apparently without the slightest thought or announcement from any source that it contained any change of substance from the Constitution of 1780 and its amendments. Article 157 was approved and ratified by the people at the November election of 1919 as much as any other part of the rearrangement. Whether these changes appear great or small at this moment is not of consequence. They are changes of substance. Few and simple words would have stated the thought that upon the approval and ratification of the rearrangement the previously existing Constitution should be revised accordingly. Those words were not used, although considered. Instead of expressing that thought, the people declared by Article 157 that the "rearrangement shall not be deemed or taken to change the meaning or effect of any part of the constitution and its amendments as theretofore existing or operative." That mandate can be given force and effect according to the natural meaning and effect of words as commonly used only by adhering to the Constitution of 1780 and its amendments as the fundamental law.

The result is that in each case the entry may be

*Petition dismissed.*

De Courcy, J. I do not concur in the views expressed in the prevailing opinion; and the importance of the case impels me to express the reasons for my dissent.

At the beginning I lay aside the advisory opinion given to the Governor and Council in January, 1920, for the reasons stated in *Young* v. *Duncan*, 218 Mass. 346, 351. "This opinion . . . was advisory in character, given by the justices as individuals, without the benefit of argument, and was not an adjudication by the court, and the rule of *stare decisis* does not apply to it. [Citing cases]. Therefore, the ground is re-examined in the light of the argument now presented, without reliance upon the earlier opinion of the justices and with the effort carefully to guard against any influence flowing from our previous consideration." It should be added that the fourth volume of the Debates in the Constitutional Convention, containing the proceedings leading to the adoption of the Rearrangement of the Constitution, had not been published when that opinion was given. The assumption made in the advisory opinion, that the committee rejected the earlier draft, called Article 159, in favor of Article 157, and the inference drawn therefrom that the substitution was made because Article 159 provided for a new constitution and Article 157 did not, prove to have been unwarranted, as it now appears that " several other forms besides Article 157 as finally adopted were submitted to the committee and debated by them." We do not know what the other drafts were or what successive changes were made in them, or the reasons therefor, because it does not appear that the sub-committee kept any record of its proceedings. We know only that Article 157 was finally adopted by the special committee, and Article 159 was not. The Constitutional Convention never acted upon, nor even saw the so called Article 159, the voters never heard of it; and it seems to me that the agreed facts do not even bring it before us for consideration. Other material facts and considerations are now presented to us for the first time. And I gratefully acknowledge the assistance derived from the clear and comprehensive arguments of able counsel.

The people of Massachusetts, at the State election of November, 1919, voted to approve and ratify the Rearrangement of the Constitution of the Commonwealth which had been submitted to

them by the Constitutional Convention. The question before us is, was that instrument submitted to and adopted by the people as the Constitution, or merely as something which would be convenient as a logical arrangement, digest or index of the provisions of the Constitution that were in force. The answer must be found in the language of the instrument, so far as its meaning is plain and clear. Where the language is of doubtful import, it must be interpreted in the light of the end designed to be realized and of the official proceedings that led to its adoption. *Old South Association* v. *Boston,* 212 Mass. 299, 304.

On January 6, 1916, the Governor addressed the Legislature and recommended the calling of a constitutional convention; stating "I believe the time has come when our constitutional system should receive that connected and careful revision which it can best receive from a Convention chosen for the purpose." The Legislature, by St. 1916, c. 98, passed "An Act to ascertain and carry out the will of the people relative to the calling and holding of a constitutional convention." Section 6 of this convention act provided that the delegates, when organized "may take into consideration the propriety and expediency of revising the present Constitution of the Commonwealth, or making alterations or amendments thereof." It added "Any such revision, alterations or amendments, when made and adopted by the said convention, shall be submitted to the people for their ratification and adoption, in such manner as the convention shall direct; and if ratified and adopted by the people in the manner directed by the convention, the Constitution shall be deemed and taken to be revised, altered or amended accordingly; and if not so ratified and adopted the present Constitution shall be and remain the Constitution of the Commonwealth." I pause here to say that the necessary implication of this last sentence is, that if the revision or amendment should be ratified by the people, the "present" Constitution would not remain the Constitution of the Commonwealth, but would be superseded by the revised Constitution. As matter of fact that is what later took place. The new instrument was "ratified and adopted by the people."

At the annual State election of 1916 the people voted "Yes" on the question "Shall there be a convention to revise, alter or amend the Constitution of the Commonwealth?" Delegates were

duly elected in pursuance of the convention act, and the convention assembled. At the sessions of 1917 and 1918 specific amendments were considered and adopted. Three of these were submitted to the people in 1917, and were ratified. Nineteen others were adopted by the convention prior to August 20, 1918; and these were adopted by the people at the State election in the November following. On said August 20, the convention, having finished the work of specifically amending the Constitution, took up the question of revision or codification by adopting the order of Mr. Washburn for a special committee of nineteen on Rearrangement of the Constitution. Here for the first time appears the word "rearrange," instead of "revise;" a substitution which is responsible for much of the present uncertainty. It was apparently adopted from the form of the resolve used by the Maine Legislature, when codifying the amended Constitution of that State; the language of the two orders being almost identical. See Laws of Maine, 1875, Res. c. 95, and 1876, Res. c. 184. When the order is read in connection with what was said by Mr. Washburn in explanation of it, the word was not inappropriate to express what in my view was the meaning of the convention. They had revised and amended the Constitution in matters of substance as fully as they deemed proper. What they apparently undertook to do was to embody in proper and logical form the provisions of the existing Constitution so far as in force, and the recent amendments; so that the Constitution when submitted to the people would be free from the dead portions cut out, and the confusion incident thereto. In fact during the debate Mr. Underhill, asking whether the committee considered placing the matter in the hands of certain State officers (rather than with the contemplated committee), referred to it as "this revision;" and in his reply, Mr. Washburn spoke of what was to be done as "this task of codification." No one suggested that it was to be anything in the nature of a digest or index.

At the close of the session of 1918 President Bates in his address to the convention, after reviewing the work already done, said as quoted in the opinion: "It has seemed to the Convention that its work could not be complete until it had submitted to the people a revised draft of the Constitution that should incorporate therein all the amendments, nearly fifty in number, adopted since the

original Constitution of 1780. It is obvious that such a revision would be of slight value if it did not include also such amendments now submitted as the people may adopt at the coming election. The Convention therefore has provided for a special committee to meet after the results of the voting in November are known. This committee is to prepare a draft of a revised Constitution, incorporating therein all the amendments that shall have been adopted then, and this draft is to be submitted to the Convention next summer. It is believed that the Convention can pass upon it then without delay and provide for its submission to the people at the following election, and having so done the Convention will adjourn *sine die*, satisfied that, to the best of its ability, it has discharged faithfully and completely the great trust reposed in it." The work of preparing the rearrangement was assigned by the special committee to a sub-committee of five; consisting of a former justice of this court, three eminent members of the bar, and a Harvard professor. They spent several months upon the work. As stated in the brief of the chairman of the sub-committee, "From the beginning the committee and the sub-committee . . . both recognized that what they were to do was not to make a new constitution, but to rearrange that of 1780 and its amendments in one consistent and connected whole, making no substantive changes, and omitting what was no longer in force. They also recognized the danger that the meaning and construction which had been given to words, phrases, and provisions in the Constitution and its amendments might be affected by omissions, and by the transpositions that were made, and by the changes in phraseology and other respects that were deemed necessary in incorporating the amendments into the text. . . . They went through the Constitution and amendments from beginning to end. They combined in logical order in a ' unified form' the loosely connected amendments and the Constitution. Transpositions of various articles and provisions were made. Changes in phraseology were introduced. New titles, groupings and divisions were adopted. What was no longer in force because deemed to have been annulled, repealed or superseded, or to have become obsolete was omitted. Certain omissions were supplied. What seemed in some cases errors were remedied. Some of the omissions that were supplied and of the errors that were corrected involved changes of a sub-

stantive nature.  They came, as the committee thought, within the scope of their authority."

The draft prepared by the sub-committee was reported to the committee; and after some changes it was reported to the convention on August 12, 1919.  The report to the convention was accompanied by three documents.  No. 1 was a reprint of the Constitution of 1780 and amendments.  No. 2 was the rearranged form, with changes in phraseology shown in italics, and with a table of the articles of the draft specifying the section numbers of the existing Constitution from which they originated.  Accompanying this was a memorandum explaining in detail the changes made by the proposed rearrangement.  Document No. 3 indicated in black-face type the omissions and transfers made of every part of the original Constitution and amendments.  In connection with the adoption of the committee's report by the convention I deem it important to emphasize three significant facts.  The first is, that the draft reported by the committee on rearrangement embodied constitutional changes of a substantive nature; and although this apparently was not authorized by the order appointing the committee, the convention ratified their act.  These changes deal with the time of taking and returning the census; the terms of senators and representatives; the time for holding the elections to fill vacancies in the offices of councillor, governor and lieutenant governor; and other subjects which are set out in the opinion of my associates, and need not be repeated.  As now appears, they were all specifically called to the notice of the convention in the memorandum accompanying the report of the special committee; and in Rearranged Form No. 2, where they appeared in italics. These changes and alterations are inextricably interwoven with the text of the so called Rearrangement.  It seems to me they are totally inconsistent with the idea that the rearranged Constitution is only a digest of a preceding instrument.  They would have no place in such a document.  They demonstrate that the committee and the convention understood that what they were preparing was a constitution which would supersede the old Constitution, if ratified and adopted by the people, in accordance with the convention act.  In view of the opinion of the majority, what now becomes of these constitutional changes, which the convention adopted and the people of the Commonwealth have ratified?

The second fact is the action of the convention in restoring to the proposed draft c. 3, art. 5 of the Constitution of 1780, which the committee had dropped as obsolete. Manifestly this restoration was unnecessary if the Constitution of 1780 was to remain in force. The action of the convention is consistent only with the view that the rearrangement was meant to be the Constitution, if ratified. The third fact, referred to in the opinion, is the answer of Mr. Parker to the inquiry of Mr. Bryant; only the last sentence of which expressed his view that provisions "now operative," omitted from the rearrangement "remained a part of the constitution." This episode is not mentioned in the Journal of the Convention. I deem it enough to say that this was the individual opinion of Mr. Parker. If it be necessary to consider the convention proceedings for the purpose of determining the effect of the instrument of 1919 upon the Constitution of 1780, the speech of an individual member of the convention cannot be assumed to represent the views of the majority; much less the views of the people by whose votes the instrument becomes a constitution, but who did not hear the debates. As was said by Mr. Justice Pitney, in *Duplex Printing Press Co.* v. *Deering,* 254 U. S. 443, 474, "By repeated decisions of this court it has come to be well established that the debates in Congress expressive of the views and motives of individual members are not a safe guide, and hence may not be resorted to, in ascertaining the meaning and purpose of the law-making body. [Citing cases]. But reports of committees of House or Senate stand upon a more solid footing, and may be regarded as an exposition of the legislative intent in a case where otherwise the meaning of a statute is obscure. . . . And this has been extended to include explanatory statements in the nature of a supplemental report made by the committee member in charge of a bill in course of passage."

The convention adopted the rearrangement as amended, and voted to submit it to the people for their ratification. In the light of the foregoing history, from the Governor's message to the Legislature suggesting the calling of a convention to revise the Constitution, to the final address of the president of the convention, every official act indicates clearly an intention to frame a constitution complete in itself. The view that the convention

appointed the special committee of nineteen to undertake the delicate and difficult task of making a new draft of the Constitution; that they reconvened in the summer of 1919 to consider the report of that committee; that they adopted it, although it contained changes of substance from the Constitution of 1780, and after they had inserted a new article by way of amendment; and that they finally provided for the submission of that new draft of the Constitution to the people, to be ratified or rejected by them; all for the mere purpose of preparing an instrument which at most would be a digest of the old Constitution and its amendments, seems to me a conclusion that is unreasonable. Indeed I find no authority in the convention act, and no basis in reason, for the convention to submit to the people a mere digest or index.

But after all, the question whether the instrument of 1919 is the Constitution, must be finally determined by the intent of the electorate. To adopt the language of Cooley, Const. Lim. (7th ed.) 101: " . . . as the constitution does not derive its force from the convention which framed, but from the people who ratified it, the intent to be arrived at is that of the people, and it is not to be supposed that they have looked for any dark or abstruse meaning in the words employed, but rather that they have accepted them in the sense most obvious to the common understanding, and ratified the instrument in the belief that that was the sense designed to be conveyed." Prior to the election a copy of the rearranged Constitution had been sent from the office of the Secretary of State to every voter. On the outside of the pamphlet were the words, " Text of the Rearrangement of the Constitution submitted by the Constitutional Convention;" implying that the whole Constitution was there, but in a different form. Preceding the text was the title "A Constitution or Form of Government for The Commonwealth of Massachusetts." Then followed the Preamble, which concluded with the words, "We, therefore, the people of Massachusetts, . . . do agree upon, ordain, and establish, the following Declaration of Rights, and Frame of Government, as the Constitution" hereof. After that came the Declaration of Rights, and the Frame of Government with its division into legislative, executive, and judicial branches and their powers and limitations; divisions relating to the military and naval forces, to the disqualifications for office, to Harvard University, and other

matters relating to the government of the State; all apparently constituting a complete charter of government. It described itself as "a constitution," or "the constitution," in many of the articles, — among them Articles 32, 36, 38, 43, 48, 60, 64, 65, 83, 84, 87, 101, 102, 119 and 134. It was referred to as "this constitution" in Articles 46, 54, 63, 78, 130, 140, 145 and 150. In Articles 63 and 158 it also was referred to as "this form of government." Article 155, amending the like provision of the old Constitution, provided that the General Court may make such alterations in the government of Harvard College "as might have been done by the General Court under the provisions of the Constitution adopted in seventeen hundred and eighty;" indicating that the Constitution of 1780 was no longer in force. The final section, Article 158, contains the words " This form of government shall be enrolled on parchment, and deposited in the secretary's office, and be a part of the laws of the land."

This court, in *Attorney General* v. *Methuen*, 236 Mass. 564, 573, speaking of an amendment to the Constitution, said: " Its phrases are chosen to express generic ideas, and not nice shades of distinction. Its words should be interpreted in 'a sense most obvious to the common understanding at the time of its adoption' because it is proposed for public adoption and must be understood by all entitled to vote." When the voter came to the polls in 1919 to answer the question " Shall the Rearrangement of the Constitution of the Commonwealth, submitted by the Constitutional Convention, be approved and ratified? " what could he have understood from all the foregoing except that the rearrangement was submitted to him as and for the Constitution of the Commonwealth? In other words, what could he have intended to ratify and adopt, if it was not to be the Constitution?

In the opinion of the majority of the court, this apparently dominant purpose of the Legislature the convention and the people is rendered nugatory by the provisions of Article 157. The first sentence of that article is " Upon the ratification and adoption by the people of this rearrangement of the existing constitution and the amendments thereto, the constitution shall be deemed and taken to be so rearranged and shall appear in such rearranged form in all future publications thereof." I find no difficulty here. Admittedly there was to be but one constitution; and the rear-

rangement of the existing one could not be the constitution unless and until it was ratified and adopted by the people. The remaining sentence is, "Such rearrangement shall not be deemed or taken to change the meaning or effect of any part of the constitution or its amendments as theretofore existing or operative." Undoubtedly the uncertainty created by this clause could have been avoided by the use of language such as is suggested in the opinion. But in determining what the voter meant (if he read this clause) we must consider it in connection with the rest of the instrument; because he would naturally assume that it was in harmony with the rest, and construe it accordingly. It seems to me that the construction he naturally and justifiably would put upon the clause in question is, that the provisions of the old Constitution re-enacted in the new draft, — in other words the rearrangement of the surviving parts of the old Constitution, — shall continue to bear the meaning which theretofore they bore, notwithstanding any change of position or juxtaposition involved in rearranging them. The addition of the words "as theretofore existing or operative," would indicate to him that some parts of the old Constitution would not be "existing or operative" thereafter; hence the propriety of preserving the meaning of such terms as survive, by a continuing clause. Whatever doubt may be cast upon the rearranged Constitution by the language of Article 157, it should be resolved so as to carry into effect the will of the people. Every reasonable presumption should be made in their favor. Above all we should not adopt an interpretation of this single clause which is wholly irreconcilable with the demonstrated purpose to revise the Constitution, and which leads to the unprecedented result of avoiding the whole instrument which the people have adopted. This very Article 157 expressly provides that the Constitution "shall appear in such rearranged form in all future publications thereof." But if the rearrangement is not the Constitution its publication can serve no useful purpose. An attempt to utilize it even as a digest of the old Constitution would prove impractical and confusing.

In my opinion the prayer of the petitioners should be granted.

CROSBY, J. Because I believe the decision in these cases to be an invasion of the rights of the voters of the Commonwealth

as expressed by the State election held November 4, 1919, and therefore wrong, I feel constrained to express my dissent.

Mandamus is an appropriate remedy to obtain the relief sought; that it will lie in the cases presented would seem to be undoubted. G. L. c. 211, § 3. *Attorney General* v. *Boston,* 123 Mass. 460, 476. *Brewster* v. *Sherman,* 195 Mass. 222. *Sinclair* v. *Mayor of Fall River,* 198 Mass. 248. *Dullea* v. *Selectmen of Peabody,* 219 Mass. 196. *Attorney General* v. *Suffolk County Apportionment Commissioners,* 224 Mass. 598. *Union Pacific Railroad* v. *Hall,* 91 U. S. 343, 355.

In the determination of the principal question before us, namely, whether the Constitution of 1780 with the amendments, or the rearranged Constitution ratified and adopted by the people at the polls, is the Constitution of the Commonwealth to be printed with the General Laws, the proceedings which occurred before the State election held in 1919 are important to be considered. In his address to the Legislature on January 6, 1916, the Governor recommended the calling of a constitutional convention to revise the Constitution. Thereafter an act, entitled " An Act to ascertain and carry out the will of the people relative to the calling and holding of a constitutional convention," was enacted by the Legislature, and was approved by the Governor on April 3, 1916. St. 1916, c. 98. Section 6 of this act provides in part that " Any such revision, alterations or amendments, when made and adopted by the said convention, shall be submitted to the people for their ratification and adoption, in such manner as the convention shall direct; and if ratified and adopted by the people in the manner directed by the convention, the Constitution shall be deemed and taken to be revised, altered or amended accordingly; and if not so ratified and adopted the present Constitution shall be and remain the Constitution of the Commonwealth." At the annual State election in 1916, the people voted that there should be a convention to revise, alter or amend the Constitution of the Commonwealth; and thereafter, in pursuance of St. 1916, c. 98, delegates to a constitutional convention were duly elected and assembled, and sessions thereof were held in the years 1917, 1918 and 1919.

On August 20, 1918, after three amendments proposed by the convention had been ratified by the people, and nineteen others

had been approved by the convention for submission to the people at the State election to be held in November, 1919, an order was adopted by the convention as follows: " *Ordered,* That a special committee on Rearrangement of the Constitution, to consist of the President and eighteen other members of the Convention to be appointed by the President, shall, after the submission to the people of all the amendments proposed by the Convention, arrange the Constitution, as amended, under appropriate titles and in proper parts, chapters, sections and articles, omitting all sections, articles, clauses and words not in force, and making no substantive change in the provisions thereof. And printed copies of the report of such committee, containing the draft and arrangement so made as aforesaid, and showing in detail any and all omissions and any and all alterations in punctuation and phraseology, shall be mailed to each delegate of the Convention; and

" *Ordered, further,* That, when the convention closes its present session, it shall adjourn, subject to call by the President or Secretary, to meet not later than within twenty days after the prorogation of the General Court of 1919, for the purpose of taking action upon such report. Any rearrangement of the Constitution with its amendments, made and adopted by the Convention, shall be submitted to the people for their ratification and adoption in such manner as the Convention shall direct."

In accordance with the order a special committee was appointed, from which five members were named by its chairman as a subcommittee. The sub-committee presented to the special committee for approval four printed documents. Document No. 2 was the rearranged form of the Constitution, and became a part of the report to the convention; it was accompanied by a memorandum showing in detail changes made by the proposed rearrangement in the existing Constitution and amendments. Thereafter, the convention added one article to the draft Constitution as proposed by the special committee, and then approved the Rearrangement of the Constitution as shown in Document No. 2, and ordered that it be submitted to the people for their ratification and adoption. At the annual State election held on November 4, 1919, the question was submitted to the people in the following form:

" Shall the Rearrangement of the Constitution of the Com-

monwealth, submitted by the Constitutional Convention, be approved and ratified?"

| Yes | |
|-----|---|
| No | |

Before the election the Secretary of the Commonwealth sent to each voter a pamphlet on the outside cover of which were the words: "Text of the Rearrangement of the Constitution submitted by the Constitutional Convention." The people voted to approve and ratify the rearranged Constitution, and the executive council in ascertaining and declaring the vote made the following record: "' The Committee of the whole Council to whom was referred the returns of votes on the Rearrangement of the Constitution of the Commonwealth submitted by the Constitutional Convention,' reported the total number of votes was 263,359 Yes. Opposed 64,978. 'And the said rearrangement appears to be ratified.'"

A recital of the foregoing undisputed facts makes it plain that the rearranged Constitution, and not the Constitution of 1780 with the amendments, is the present State Constitution, unless Article 157 requires a different conclusion.

The advisory opinion given to the Governor and Council, that the "'Rearrangement of the Constitution' is not the 'Constitution or Form of Government for the Commonwealth of Massachusetts,'" was merely the individual opinion of the Justices, based upon the facts and considerations then before them, without the benefit of argument; it was not an adjudication by the court, and is not to influence the court in their determination of the present cases. *Young* v. *Duncan,* 218 Mass. 346, 351. *Perkins* v. *Westwood,* 226 Mass. 268.

The question is before the court for the first time to be decided upon the agreed facts in the light and with the assistance of the arguments presented. Material facts now submitted to the court, were not before the Justices at the time the advisory opinion was given.

In 1918, when the order for the Rearrangement of the Constitution went into effect, a period of one hundred and thirty-eight years had elapsed since the establishment of the fundamental law; and in the meantime many changes and additions had been made in its provisions by amendment. At the time of the adoption of the order there were forty-seven amendments, and nineteen others

had been agreed to by the convention for submission to the people at the State election to be held in the November following. In the light of these facts it fairly may be inferred that the convention in adopting, and the people in ratifying, the rearrangement intended to relieve the confusion in which the fundamental law then was, by arranging it in such form as would bring the original Constitution and its amendments together in one document and make plain its provisions. That such was the dominant purpose of the Governor in recommending the calling of the convention in 1916, would seem to be apparent from that part of his address to the Legislature where he said, "No Constitutional Convention has been held in Massachusetts since 1853. It is doubtful if another period of history of equal length can be found more characterized by social and industrial change than the sixty-two years which have elapsed since that time. After so long and so restless an interval, during which nothing but piecemeal revision has been considered, in the first instance by Legislatures, I believe the time has come when our constitutional system should receive that connected and careful revision which it can best receive from a Convention chosen for the purpose." It seems to me impossible to doubt that the convention, having finished the work of specifically amending the Constitution in August, 1918, then deemed it advisable that the Constitution as a whole, with all its amendments, should be embodied in one instrument; and that such was the intention of the convention and the purpose of the order adopted on August 20. Unless the rearranged Constitution was intended by the convention and by the people to be the Constitution of the Commonwealth, it has no binding force or effect. It is not to be presumed that the convention in agreeing to it, after many months in its preparation, and that the people in ratifying it, meant that their acts should be a mere nullity. There is nothing to indicate that the rearrangement should be simply an index or digest of the Constitution of 1780 with the amendments. The committee had no authority for that purpose, its duty was to "arrange the Constitution, as amended, under appropriate titles and in proper parts, chapters, sections and articles, omitting all sections, articles, clauses and words not in force, and making no substantive change in the provisions thereof." In the Constitution as rearranged a few changes of substance were made; if it be assumed that these

new provisions were beyond the power of the committee to propose, they were duly adopted by the convention and ratified by the people acting within their sovereign rights.

The question to be decided seems to be based principally if not wholly upon the construction of Article 157. The language there used appears to me to be plain and free from ambiguity. It must be construed in connection with the instrument as a whole. The petitioners contend that its ordinary and natural significa- tion is that the provisions of the Constitution of 1780 together with the amendments re-enacted in the rearranged Constitution shall not change the meaning of such parts of the old Constitution and amendments as then remained in force, and which would no longer be valid when the new instrument was ratified and adopted by the people unless carried forward by some provision in Article 157. The act of the people in approving and ratifying the rear- rangement was a codification and revision of the Constitution of 1780, — omitting parts that had become obsolete, rearranging what remained active, and adding some new provisions of substance. The effect of this article, as it seems to me, is to preserve the settled meaning and interpretation given to the original Constitution so far as its provisions are the same in the new instrument. While in accordance with well settled rules that meaning and interpre- tation would doubtless prevail, yet to prevent the possibility of their being changed the article in question was incorporated in the rearrangement, thereby embodying in the fundamental law a rule of construction which the different departments of our government were bound to follow.

The plain implication of the language to me is that upon the ratification and adoption by the people of the new instrument, the original Constitution is no longer "existing or operative." If the language standing alone is of doubtful meaning, it is made clear when considered in connection with the instrument as a whole. Accordingly, I am of opinion that neither the debates in the convention, nor the testimony or opinions of members of the convention as to the construction of Article 157, can be considered in deciding the issue presented.

In *Old South Association* v. *Boston*, 212 Mass. 299, in construing the language of a statute the meaning of which was not doubtful, it was said at pages 304 and 305: "Although the plain meaning

of a statute cannot be affected by resort to the proceedings incident to its passage (*Boston & Providence Railroad* v. *Midland Railroad*, 1 Gray, 340, 366; *Browne* v. *Turner*, 174 Mass. 150, 159; *Boston* v. *Talbot*, 206 Mass. 82, 91), it is permissible to examine records of legislative proceedings to illumine language of doubtful import." In *Boston* v. *Talbot*, 206 Mass. 82, where the effect and validity of a taking of land by the Boston transit commission under St. 1902, c. 534, for use in the construction of a tunnel beneath Washington Street in Boston were in question, Chief Justice Knowlton said, at page 91: "We come now to the defendant's offer of proof. It is to be remembered that this is an offer of evidence to control the construction of a writing which stands in the place of a legislative act. It is not competent to inquire into the individual opinion or motive of any member of the Boston transit commission. Said Mr. Justice Field in giving the opinion of the court in *Soon Hing* v. *Crowley*, 113 U. S. 703, 710: 'The rule is general with reference to the enactments of all legislative bodies that the courts cannot inquire into the motives of the legislators in passing them, except as they may be disclosed on the face of the acts, or inferrible from their operation, considered with reference to the condition of the country and existing legislation. . . . The diverse character of such motives, and the impossibility of penetrating into the hearts of men and ascertaining the truth, precludes all such inquiries as impracticable and futile.' . . . While facts that appear in connection with the proceedings in the enactment of statutes may sometimes be shown for the purpose of illustrating the subject to which the statute applies, the expression of individual opinions, in debates or otherwise, is never competent. Under this principle, most of what was offered was incompetent. 'The sense of the commission,' the belief of the commission, and the 'conclusion' of the commission in reference to the taking, are to be determined from their final act of taking. The offers, in these particulars, seem to be attempts to show the views and opinions of individual members of the commission, which could not be put in evidence." In *Aldridge* v. *Williams*, 3 How. 1, at page 24, it was said in construing a legislative act: "The law, as it passed, is the will of the majority of both houses, and the only mode in which that will is spoken is in the act itself; and we must gather their intention from the language there used, comparing it, when any ambiguity exists, with the

laws upon the same subject, and looking if necessary, to the public history of the times in which it was passed."

In my opinion the debate in the convention, at the meeting to consider the report of the committee on the rearranged Constitution, is of no weight and cannot properly be considered in determining whether the old or the new Constitution is the present Constitution of the Commonwealth. The inquiry of a member as to the meaning of the instrument reported by the committee, and his opinion respecting it, and the reply of a member of the committee, cannot be found to represent the views of the majority of those present. The fact that no reply was made to the opinions expressed did not bind all the members nor indicate that the majority acquiesced in the construction so stated. The language of the court in *United States* v. *Trans-Missouri Freight Association,* 166 U. S. 290, at pages 318, 319, would seem to be pertinent upon this question. It is there said: " There is, too, a general acquiescence in the doctrine that debates in Congress are not appropriate sources of information from which to discover the meaning of the language of a statute passed by that body. . . . The reason is that it is impossible to determine with certainty what construction was put upon an act by the members of a legislative body that passed it by resorting to the speeches of individual members thereof. Those who did not speak may not have agreed with those who did; and those who spoke might differ from each other; the result being that the only proper way to construe a legislative act is from the language used in the act, and, upon occasion, by a resort to the history of the times when it was passed." *Mitchell* v. *Great Works Milling & Manuf. Co.* 2 Story, 648, 653. *Legal Tender Case,* 110 U. S. 421, 444. *United States* v. *Wong Kim Ark,* 169 U. S. 649, 699. *United States* v. *St. Paul, Minneapolis & Manitoba Railway,* 247 U. S. 310, 318. *Duplex Printing Press Co.* v. *Deering,* 254 U. S. 443. *Southwark Bank* v. *Commonwealth,* 26 Penn. St. 446, 450. *Newell* v. *People,* 7 N. Y. 9. *State* v. *Board of Curators of University of Missouri,* 268 Mo. 598. *Taylor* v. *Taylor,* 10 Minn. 107, 125. *G. & D. Taylor & Co.* v. *Place,* 4 R. I. 324. *People* v. *May,* 3 Mich. 598, 605. If the debate above referred to cannot be said necessarily to represent the views of the majority of the convention, with stronger reason it cannot reflect those of the majority of the people who did not hear it. If

the meaning of Article 157 be regarded as obscure or ambiguous, and it is permissible to recur to the proceedings of the convention in adopting the rearrangement and to the act of the people in ratifying it, it seems equally clear that it was intended to supplant the Constitution of 1780.

The president of the convention in August, 1918, when its sessions were about to adjourn and its labors of proposing and adopting specific amendments had been practically completed, stated: " It has seemed to the convention that its work could not be complete until it had submitted to the people a revised draft of the Constitution that should incorporate therein all the amendments, nearly fifty in number, adopted since the original Constitution of 1780. It is obvious that such a revision would be of slight value if it did not include also such amendments now submitted as the people may adopt at the coming election. The convention therefore has provided for a special committee to meet after the results of the voting in November are known. This committee is to prepare a draft of a revised Constitution, incorporating therein all the amendments that shall have been adopted then, and this draft is to be submitted to the Convention next summer. It is believed that the Convention can pass upon it then without delay and provide for its submission to the people at the following election, and having so done the Convention will adjourn *sine die,* satisfied that, to the best of its ability, it has discharged faithfully and completely the great trust reposed in it." This statement makes it apparent that the special committee was expected to prepare a draft of the Constitution as revised by it to be submitted to the convention the following year; that such revised Constitution should be submitted to the people for ratification in the fall of 1919; and that that having been accomplished it was believed the work of the convention would be fully performed. During the following winter and spring the sub-committee prepared four documents, and presented them for approval to the full committee in May, 1919. Document No. 1 was a reprint of the Constitution of 1780 and its amendments, with its parts, chapters and sections numbered consecutively for the information and convenience of the full committee and the convention; and was included in the report which, after many meetings, was made by the committee to the convention on August 12, 1919. The report, in part, is as

follows: "The object of the order [that is the order whereby provision was made for the rearrangement of the Constitution] was, as the committee understands it, to have the existing Constitution and its amendments, sixty-six in all, brought together in one body, omitting all 'sections, articles, clauses and words' which by the lapse of time, or by repeal, or annulment, or otherwise have ceased to be in force, and making such rearrangement, with the changes in phraseology and punctuation necessarily involved, as would form a consistent and connected whole. The committee are of opinion that it manifestly was not intended that they should draft a new Constitution embodying the existing Constitution and amendments, and they have not attempted to do so. They have considered that their duty in that regard was confined to one of rearrangement. The committee have construed the order to mean that it was the will and purpose of the convention that no change in the existing Constitution and its amendments should be made by the committee which would or might in any way affect their meaning or present construction, or the construction which has heretofore been given to the provisions thereof, and they have carefully refrained from making any change which, it seemed to them, would or might have that effect. Where there was an obvious omission, or a manifest ambiguity, as there seems to have been in a few cases, or where a change in phraseology or punctuation was rendered necessary by the rearrangement, or by the omission of words, phrases or articles, and when it was clear that another word or phrase should be substituted for the one used, to secure consistency, or uniformity in language, the committee deemed that it came within the scope of their duty to supply such omissions or remove such ambiguity or make such changes, and they have done so. The textual changes so made have been comparatively few." The memorandum states, with reference to Article 157, (being Article 156 in the "Text of the Rearrangement"): "This is a new division and title. It adopts in part the language of the act for calling and holding the convention (St. 1916, c. 98), and is introduced to show that the proposed draft, if adopted, is to be regarded as a continuation of the existing Constitution and amendments so far as the provisions thereof are in force, and that no substantive change in the present meaning and construction or that which has been heretofore given to them is intended."

In view of the order of the convention that the committee should make a rearrangement "omitting all sections, articles, clauses and words not in force" in the old Constitution, it seems reasonable to infer that the instrument prepared and submitted by it to the convention was a new Constitution in which were embodied the provisions of the old Constitution so far as they had not been changed. The inclusion of Article 157 I think was to establish a rule of construction to the effect that the provisions of the Constitution of 1780 and the amendments, which were embodied in the rearrangement, should have the same meaning and interpretation as had heretofore been given to them. I cannot believe that it was the purpose of the convention, or of the people, to repeal any new provisions of the rearranged Constitution or to continue in force those in the original Constitution which had been eliminated therefrom because not operative. The circumstance that a few changes of substance were made in the rearrangement and ratified by the people make it plain it was intended that the provisions of the old Constitution should no longer be valid, but were superseded by the new.

In the performance of their duty, the committee in preparing the rearrangement was ordered to omit "all sections, articles, clauses and words not in force" and to send printed copies of the report "showing in detail any and all omissions and any and all alterations," to each delegate by mail. Accordingly, "Rearrangement Document No. 3 Omissions from the Present Constitution," explaining in detail the omissions and the reasons therefor, was sent to each delegate.

On August 13, 1919, the convention adopted an order providing for the manner in which the rearranged Constitution should be submitted to the people, entitled "A Constitution or Form of Government for the Commonwealth of Massachusetts." Its last article (158) provides that "This form of government shall be enrolled on parchment, and deposited in the secretary's office, and be a part of the laws of the land; and printed copies thereof shall be prefixed to the book containing the laws of this Commonwealth, in all future editions of such laws."

The instrument submitted by the convention to the people and adopted and ratified by more than four fifths of the total vote contains no reference to rearrangement, revision or codification;

and whatever construction or differences of meaning may be attached to these words becomes immaterial, as the instrument adopted by the convention and ratified by the people declares that it is "A Constitution or Form of Government for the Commonwealth of Massachusetts." That the delegates and the people intended it to be something else, or of no binding force or validity, would seem to me to be a conclusion that ought not to be reached. If it is permissible to refer to the debates in the convention for the purpose of ascertaining the intention of the members, the closing address of the president is illuminating. He said, in part: "We assembled at this session of 1919 for one distinct purpose. It was that we might submit to the people for their adoption a *rearranged Constitution* containing within its text all that is not at present obsolete of our original Constitution and of the sixty-six amendments that have been passed since 1780. Owing to the efficient and faithful manner in which the special committee on rearrangement, headed by Mr. Morton of Fall River, and to whom you have just paid such well deserved tribute, has discharged its work, there has been nothing left for you to do but to adopt it practically as it came from the committee and to submit it to the people. This you have done, and in so doing you have rounded out and completed your work."

Before the election the Secretary of the Commonwealth sent to each voter a pamphlet containing a copy of the text of the rearrangement (together with certain referendum question) on the outside page of which was printed the following:

## "THE COMMONWEALTH OF MASSACHUSETTS
### Office of the Secretary
### State House, Boston

## TEXT OF THE REARRANGEMENT OF THE CONSTITUTION SUBMITTED BY THE CONSTITUTIONAL CONVENTION

### together with

REFERENDUM QUESTIONS SUBMITTED TO VOTERS UNDER AMENDMENTS TO THE CONSTITUTION, ARTICLE XLVIII, GENERAL PROVISIONS, IV, INFORMATION TO VOTERS

STATE ELECTION, NOVEMBER 4, 1919
[cut of state seal]
Boston
Wright & Potter Printing Co., State Printers
32 Derne Street
1919 "

Every presumption is to be made in favor of the apparent pur-
pose of the people, in the exercise of their sovereign power, in
adopting and ratifying a constitution or in amending, revising and
codifying an existing constitution. This presumption cannot be
overcome, but must prevail in the cases at bar, unless the act of
the people is clearly shown to be inconsistent with a purpose to
adopt and ratify a new constitution.

The people in ratifying a constitution are presumed not to have
adopted and ratified one which was to be without validity or
binding force. The same presumption applies to legislative enact-
ments. *Borden* v. *Enterprise Transportation Co.* 198 Mass. 590,
592. In *Kendall* v. *Kingston,* 5 Mass. 524, it was said by Chief
Justice Parsons, at page 534: ". . . certainly the construction of
the constitution by the legislature ought to have great weight, and
not to be overruled, unless manifestly erroneous." In *Wellington,*
*petitioner,* 16 Pick. 87, where the question of the constitutionality
of a statute was involved, it was said by Chief Justice Shaw at
page 95: ". . . the delicacy and importance of the subject may
render it not improper, . . . that when called upon to pronounce
the invalidity of an act of legislation passed with all the forms and
solemnities requisite to give it the force of law, courts will approach
the question with great caution, examine it in every possible as-
pect, and ponder upon it as long as deliberation and patient at-
tention can throw any new light on the subject, and never declare
a statute void, unless the nullity and invalidity of the act are
placed, in their judgment, beyond reasonable doubt." This
language would seem to apply with even stronger reason where
an attempt is made to overthrow a constitution ratified by the
people in conformity with all the required legal formalities. *Og-*
*den* v. *Saunders,* 12 Wheat. 213. Cooley, Const. Lim. (7th ed.)
252, 254, and note. In *Newell* v. *People, supra,* a case involving
the construction of a constitutional provision, it was said, at page

97: " . . . when we are speaking of the most solemn and deliberate of all human writings, those which ordain the fundamental law of States, the rule rises to a very high degree of significance. It must be very plain, nay, absolutely certain, that the people did not intend what the language they have employed, in its natural signification, imports, before a court will feel itself at liberty to depart from the plain reading of a constitutional provision."

Beginning with the date of the passage of the statute (St. 1916, c. 98) entitled " An Act to ascertain and carry out the will of the people relative to the calling and holding of a constitutional convention," up to and including the report of the committee of the executive council declaring that " said rearrangement appears to be ratified," every requisite formality necessary to the validity of the act of the convention in adopting, and of the people in ratifying, the rearrangement, was observed; and no contention is made to the contrary. To recapitulate: the order appointing the committee to arrange the Constitution was adopted on August 20, 1918. On August 12, 1919, the committee reported to the convention the result of its labors covering a period of nearly a year. The document which it reported and the convention adopted and the people afterwards ratified is entitled " A Constitution or Form of Government for the Commonwealth of Massachusetts." It embodies in substance and in proper form the provisions of the Constitution of 1780 that have not been repealed nor superseded, and contains all amendments in force when ratified by the people; it is lacking in no particular of being a complete embodiment of the fundamental law.

The instrument speaks for itself. I am of opinion that it is what it purports to be, and is such a constitution as is provided for under § 6 of the convention act (St. 1916, c. 98). For the reasons stated it seems plain to me that the instrument ratified by the people at the annual election of 1919 is the State Constitution and as such should be printed with the General Laws. To declare that the Constitution of 1780 with the amendments remains the Constitution of the Commonwealth, in my opinion defeats the dominant object sought to be accomplished, namely, to revise the Constitution (St. 1916, c. 98, § 1) by so arranging and codifying the fundamental law as to obviate the confusion and difficulty previously existing in its construction due to the many changes

wrought by amendments adopted at various times during the one hundred and thirty-eight years that had elapsed since 1780. The fundamental law ought to be in such form that it can readily be understood by the people at large.

To decide that the rearranged Constitution is not the present Constitution reaches a result contrary to the intent and purpose of the majority of the members of the convention, and of the people, as shown by the instrument itself. The competent facts presented by the record would seem to indicate a purpose to make a new constitution complete in all its parts. If instead of the word "rearrangement" in Article 157 the word "revision" had been used, it cannot be doubted that the instrument in question would supersede the Constitution of 1780 and the amendments. The language of that article should not be construed with such verbal nicety as will result in defeating the will of the people. We should rather seek to ascertain the effect of the words used which would appear most natural and obvious to the common understanding. *Attorney General* v. *Methuen,* 236 Mass. 564. *Bishop* v. *State,* 149 Ind. 223. Cooley, Const. Lim. (7th ed.) 101. The word "rearrangement" as used in Article 157, in my opinion was in effect synonymous with the word "revision" or "codification;" this is the reasonable inference when the proceedings of the convention and the instrument as finally adopted are considered. To hold that the committee in the performance of their duty, after many months of deliberation reported the rearrangement, and that the convention after making certain amendments thereto adopted it, and the people ratified it by an overwhelming vote with no intention that it should be of any validity whatever, is a conclusion that I am unable to reach.

I am of opinion that the Constitution of 1919 should be printed in the first volume of the General Laws as the Constitution of the Commonwealth; and that a writ of mandamus should issue in each case as prayed for.