# SUPPLEMENT.

*Constitutional Law*, Initiative.  *General Court.*

Under art. 48 of the Amendments to the Constitution, The Initiative, V,
§ 1, a branch of the General Court has no power on or after the first
Wednesday of June to vote, either in the affirmative or in the negative,
upon the enactment of a law proposed by an initiative petition.

To the Honorable the Senate of the Commonwealth of
Massachusetts:

The Justices of the Supreme Judicial Court respectfully
submit these answers to the questions set forth in an order
adopted by the Senate on June 7, 1945, and transmitted to
the Justices on June 8, 1945.  Copy of the order is hereto
annexed.

The questions submitted arise out of facts stated in the
order and summarized as follows:  An initiative petition for
a law (printed as House, No. 473) was introduced into the
General Court.  The House of Representatives enacted said
proposed law on Tuesday, June 5, 1945, by a vote taken
by yeas and nays.  When the proposed law came up for
action in the Senate on Thursday, June 7, 1945, a point of
order was raised that the proposed law was not properly
before the Senate for action thereon for the "reason that
Section 1 of Part V of Article XLVIII of the Amendments
to the Constitution provides that a vote on such a bill shall
be taken by the yeas and nays in both Houses before the
first Wednesday in June upon the enactment of such law
in the form in which it stands in such petition, and for the
further reason that said bill was not before the Senate until
Thursday, June seventh, nineteen hundred and forty-five."

Significant portions of art. 48 of the Amendments to the
Constitution of the Commonwealth are as follows:  The

Initiative, V, § 1, of said art. 48 provides in part: "Legislative Procedure. — If an initiative petition for a law is introduced into the general court, signed by not less than twenty thousand qualified voters, a vote shall be taken by yeas and nays in both houses before the first Wednesday of June upon the enactment of such law in the form in which it stands in such petition. If the general court fails to enact such law before the first Wednesday of June, and if such petition is completed by filing with the secretary of the commonwealth, not earlier than the first Wednesday of the following July nor later than the first Wednesday of the following August, not less than five thousand signatures of qualified voters, in addition to those signing such initiative petition, which signatures must have been obtained after the first Wednesday of June aforesaid, then the secretary of the commonwealth shall submit such proposed law to the people at the next state election." Section 2 of said The Initiative, V, provides in part: "Amendment by Petitioners. — If the general court fails to pass a proposed law before the first Wednesday of June, a majority of the first ten signers of the initiative petition therefor shall have the right, subject to certification by the attorney-general filed as hereinafter provided, to amend the measure which is the subject of such petition." And provision is made for submission to the people of the amended measure in like manner as in the case of a measure that has not been amended.

The first question submitted is: "Was the said initiative bill repealing the old age assistance law and substituting therefor an old age pension law to be administered by the Commonwealth in conformity with the law, rules and regulations promulgated thereunder of the Federal Social Security Act so as to be eligible for financing in part by federal funds (printed as House No. 473) properly before the Senate for enactment on Thursday, June seventh, nineteen hundred and forty-five when said point of order was raised?"

The constitutional provisions relating to an initiative petition for a law were for the purpose of providing for the exercise by the people of the power expressly reserved to them

by art. 48, I, whereby "the people reserve to themselves the popular initiative, which is the power of a specified number of voters to submit constitutional amendments and laws to the people for approval or rejection." Thus, the basic purpose of the constitutional provisions relating to initiative petitions for laws is to provide for legislation by the people. Though this is the basic purpose of these constitutional provisions, a limited power is conferred thereby upon the General Court to vote upon the enactment of a law proposed by an initiative petition, obviously for the purpose of permitting the General Court by enacting such a proposed law to render unnecessary the submission thereof to the people. The limited power so conferred upon the General Court is stated in language mandatory in form that "a vote shall be taken by yeas and nays in both houses before the first Wednesday of June upon the enactment of such law."

The question submitted raises the point whether it was within the limited power conferred upon the General Court for either branch thereof to take a vote on or after June 6, 1945 — the first Wednesday of June — upon the enactment of a law proposed by an initiative petition. A somewhat similar question was considered by the Justices in *Opinion of the Justices*, 237 Mass. 589. The question there involved related to the provision in art. 48, The Initiative, IV, dealing with legislative action on proposed constitutional amendments, providing in § 2 thereof that a proposal for a specific amendment to the Constitution "shall, not later than the second Wednesday in June, be laid before a joint session of the two houses." The Justices stated: "The meaning of these words is unmistakable. The named date is fixed as the latest moment in any year when a proposed amendment to the Constitution can for the first time be brought before the joint session. It is not possible to treat these words of the amendment as precatory or merely directory. . . . Specifications in the Constitution respecting the time when or prior to which powers may be exercised, must be presumed to have been designed by the people to describe the only time at which such powers may be exercised. . . . It fol-

lows from these settled principles of constitutional law that the action of the General Court in agreeing to the proposed amendment at the extra session in December, 1920, was without validity" (pages 590–591).

The principles stated in *Opinion of the Justices*, 237 Mass. 589, 590–591, above quoted, with reference to a provision in art. 48, The Initiative, IV, § 2, relating to constitutional amendments proposed by initiative petitions, are equally applicable to the provision now in question relating to laws proposed by initiative petitions. Consequently, a vote taken by either branch of the General Court on or after June 6, 1945 — the first Wednesday of June — upon the enactment of a law proposed by an initiative petition would be without validity. The difference in the language of the two constitutional provisions — in one "before the first Wednesday of June" and in the other "not later than the second Wednesday in June" — furnishes no ground for a difference in the interpretation of the two constitutional provisions. Nor does the difference in the subject matter of the two provisions furnish a ground for a difference in interpretation.

The context of the constitutional provision here in question furnishes support, if support were needed, for an interpretation thereof in accordance with the principles stated in *Opinion of the Justices*, 237 Mass. 589, 590–591. Said § 1 of art. 48, The Initiative, V, contains a provision with respect to procedure applicable if "the general court fails to enact such law before the first Wednesday of June." Clearly, the General Court "fails to enact" such law if it votes adversely thereon in either house or if either house, notwithstanding the constitutional mandate that a "vote shall be taken . . . in both houses before the first Wednesday of June upon the enactment of such law," fails to take such a vote. (A like interpretation is to be given to the words "fails to pass a proposed law" in the provision of § 2 of said art. 48, The Initiative, V, relating to amending the proposed measure.) Whether or not the General Court has failed to enact a proposed law must be determined as of some date. By the express terms of the constitutional

provision that date is fixed as the first Wednesday of June. Thereupon the constitutional provisions fixing the procedure for submission to the people of a law proposed by an initiative petition become operative. Those provisions fix in express terms the times within which certain specified steps shall be taken.

The petition must be completed by obtaining additional signatures thereto "after the first Wednesday of June," and these additional signatures must be filed with the Secretary of the Commonwealth "not earlier than the first Wednesday of the following July nor later than the first Wednesday of the following August." Obviously, these times are fixed on the basis that the fact that the General Court had failed to enact the proposed law was definitely established by the first Wednesday of June. No adverse vote of the General Court upon the enactment of the proposed law taken on or after this date would have any effect in determining that the General Court had failed to enact the proposed law, or any effect upon the times within which the several steps essential to submission of the proposed law to the people must be taken. Such an adverse vote taken on or after the first Wednesday of June would be wholly without effect — even the limited effect of such an adverse vote taken before the first Wednesday of June.

The Constitution contemplates that the General Court in voting upon the enactment of a law proposed by an initiative petition may vote either for or against the enactment of such law. An interpretation of the governing constitutional provisions as permitting the General Court to vote for the enactment of such law on or after the first Wednesday of June, although the General Court then had no power to vote against the enactment of such law, would be an unreasonable interpretation of the language of these constitutional provisions. No implication that a restricted power of voting, after the first Wednesday of June, only for the enactment of the proposed law was conferred upon the General Court can rightly be drawn from these constitutional provisions. On the contrary these constitutional provisions negative such an implication.

The provision in art. 48, The Initiative, V, § 2, permitting a majority of the first ten signers of the initiative petition, subject to certification by the Attorney General, to amend a proposed law, if "the general court fails to pass . . . [such] proposed law before the first Wednesday of June," also imports that on or after that date the General Court has no power to vote either for or against the enactment of such law. Clearly it was not intended to give to the petitioners for a proposed law the right to amend such law while it was before the General Court for a vote upon its enactment. The power of the General Court was limited to taking a vote "upon the enactment of such law in the form in which it stands in such petition." Art. 48, The Initiative, V, § 1. The power expressly conferred upon the petitioners to amend the proposed law, if the General Court failed to pass it before the first Wednesday of June, is incompatible with a power in the General Court to enact such proposed law on or after the first Wednesday of June.

In our opinion, the language of art. 48, The Initiative, V, § 1, that "a vote shall be taken . . . in both houses before the first Wednesday of June upon the enactment of such law" is mandatory to the effect that such vote shall be taken before that date, and implies that, if no such vote is then taken, neither house has power to take such a vote at any later time, so that the proposed law (printed as House, No. 473) was not properly before the Senate for enactment on Thursday, June 7, 1945.

The answer to the first question submitted is in the negative.

The second question submitted is: "What would be the legal effect if the Senate should enact said bill on or after the said first Wednesday of June?"

In our opinion, for the reasons stated in answer to the first question submitted, a vote by the Senate taken after the first Wednesday of June to enact the proposed law would be without legal effect.

The third question submitted is: "In case the Senate should enact said bill on or after the said first Wednesday

of June may it properly be laid before the Governor for his approbation?"

In our opinion, for the reasons stated in answer to the first question submitted, this question must be answered in the negative.

In accordance with established practice this opinion is limited to answering the specific questions submitted. *Opinion of the Justices,* 275 Mass. 580, 582.

> FRED T. FIELD.
> HENRY T. LUMMUS.
> STANLEY E. QUA.
> ARTHUR W. DOLAN.
> JAMES J. RONAN.
> RAYMOND S. WILKINS.
> JOHN V. SPALDING.

JUNE 13, 1945.

THE HONORABLE JOHN CRAWFORD CROSBY, an Associate Justice of this court from December 31, 1913, until October 1, 1937, died at Pittsfield on October 14, 1943. On December 8, 1945, a special sitting of the full court was held at Boston, at which there were the following proceedings:

The Attorney General addressed the court as follows:

May it please your Honors: The Bar of the Commonwealth desires to present through me to this court a Memorial recently adopted by its committee upon the death of the Honorable John Crawford Crosby.

JOHN CRAWFORD CROSBY: A MEMORIAL.

JOHN CRAWFORD CROSBY, scion of ancestral lines, some of which run far back into the early history of this country, and the son of John and Margaret (Crawford) Crosby, was born in Sheffield, Massachusetts, June 15, 1859.

In his early youth he attended the public schools of Berkshire County and was graduated from the Eastman Business College at Poughkeepsie, New York. He began the study of law in the office of the late Marshall Wilcox of Pittsfield; then entered the law school of Boston University from which he graduated in 1882, and that same year was admitted to the Bar in Berkshire County. At the beginning of his professional life he was associated with the late United States Senator Henry L. Dawes. In 1894 he became a member of the firm of Crosby and Noxon, a partnership which continued until the year 1905, when he was appointed Associate Justice of our Superior Court. During this period, the firm of Crosby and Noxon was one of the outstanding law firms in western Massachusetts.

Those of us who knew and loved Judge Crosby have pleasure in recalling his visual image. He was tall and of powerful physique. His face was handsome, his friendly smile heartwarming. Plutarch has said, "It is indeed a

desirable thing to be well descended, but the glory belongs to our ancestors." To have a fine body, a noble bearing, and a handsome face, as did Judge Crosby, may also be a glory that belongs to his ancestors.

But what of Judge Crosby himself, that inner man of his own making? He had three of the great virtues which make for nobility of character.

Judge Crosby was a man of charity in the true scriptural sense of the word — the charity that is "not puffed up" and "vaunteth not itself." Such charity is only possessed by the man who from rich experience knows and understands the frailties common to all mankind. With Judge Crosby friendliness was not a social veneer; his helpfulness not a pose. But in him these two qualities welled up constantly from a kindly and sympathetic heart.

His second great quality was common sense. This quality is of value in every walk of life. It is of vital importance to a judge, whose decisions must be accepted as reasonable and just, not only by the litigants but by posterity. What has been said of the late eminent Judge John Wilkes Hammond can be said with equal truth of Judge Crosby. "He covered 'with his hat more wit an' gumption an' shrewd Yankee sense than there is mosses on an ole stone fence.'" Sir Edward Coke in his First Institute said, "Reason is the life of the law; nay, the common law itself is nothing else but reason." The common sense which Judge Crosby brought to his work on the bench both on the Superior Court and on this court is a Yankee expression interchangeable with the word "reason" as used by Lord Coke.

The third great moral quality possessed to a marked degree by Judge Crosby was indefatigable industry. It is well remembered by Judge Crosby's older friends and by the older members of the Berkshire Bar that it was his common practice to work long hours at his office and more often than not into the late hours of the evening. This industry was the more noteworthy because at that time life was not lived at the tempo of today and law practice in a community such as Pittsfield was carried on by the majority of lawyers at a more leisurely pace.

These qualities of warmhearted friendliness and sympathetic helpfulness, of shrewd common sense and of habitual diligence were the qualities of mind and character which won for Judge Crosby the friendship and respect of his fellow citizens.

Judge Crosby, by inheritance as well as by inclination, belonged to a political party which during the active years of his political life was not the party of the majority in Berkshire County or in Pittsfield. Nevertheless, he was elected repeatedly to offices of honor and trust by his fellow citizens, many of them members of the opposition party. He served in the Massachusetts House of Representatives in the years 1886 and 1887; in the Massachusetts State Senate in the years 1888 and 1889. He was elected as a member of the Fifty-second Congress of the United States in the year 1890. In 1894 and 1895 he served two terms as mayor of Pittsfield and he was city solicitor for Pittsfield for a number of years. As a member of the Massachusetts Senate he was instrumental in procuring for Pittsfield its city charter. He was chairman of the commission which procured for Pittsfield a new and badly needed railroad station, a station which still serves the city adequately. In 1905 he was appointed Associate Justice of our Superior Court by Governor Douglas and in December, 1913, was appointed Associate Justice of this Court. When he resigned from this Court on October 1, 1937, at the age of seventy-eight, he had ably served the Court for nearly a full generation, to be precise, a period of twenty-four years. During this same period, he wrote approximately thirteen hundred opinions.

The Bar of this Commonwealth with solemn pride in the character and achievements of Judge Crosby, a good and faithful public servant throughout the long years of his active life, requests me to move in its behalf that this Memorial be spread upon the records of this court.

Damon E. Hall, Esquire, addressed the court as follows:

My intimate acquaintance with Berkshire County goes back nearly to the time when Judge Crosby was admitted to the Bar in 1882.    At that early date the name of Crosby was well known in Berkshire County.    Judge Crosby's father was then a deputy sheriff.    Beginning January 1, 1887, and continuing through the year 1895 his father was high sheriff of Berkshire County.    During that period his son came upon the scene as a young lawyer of great promise and much zeal.    In 1894 John Crosby became a member of the firm of Crosby and Noxon, then and for many years thereafter the outstanding legal firm in Berkshire County. It has been said that from 1894 to 1905, when he became a Justice of the Superior Court, his firm tried more than half the cases at every sitting of the Superior Court in Berkshire County.    Reference has been made to the many elective offices Judge Crosby held almost from the time of his admission to the bar until his appointment to the Superior Court bench.    Both Judge Crosby and his father were Democrats, and the fact that they were repeatedly elected to high office in a Republican stronghold such as Berkshire County is eloquent testimony of the respect in which both of them were held and of the quality of public service which both of them rendered.

Although not a graduate in the arts of any college or university, the esteem in which his public service and his character were held brought to him the honorary degrees of LL.D. from both Boston University and from Williams College.    The citations accompanying these degrees are far more eloquent than any words I can summon for this memorial.    Therefore, I ask permission to quote them.    The Boston University citation was as follows:

John Crawford Crosby, graduate of Boston University with the degree of LL.B. 1882 — fifty years ago this month; faithful servant of the people in State Legislature and in the United States Congress, and in many judicial positions; now Justice of the Supreme Judicial Court of Massachusetts.

Professor Wild's citation at Williams College was as follows:

For the Honorary Degree of Doctor of Laws I present John Crawford Crosby, a native and life-long resident of this County. He graduated from the School of Law of Boston University in 1882, and was a member of the House of Representatives and the Senate of Massachusetts, and of the 52nd Congress. He was Mayor of Pittsfield from 1894 to 1895, was Justice of the Superior Court for eight years; and for the last sixteen years, Justice of the Supreme Court of Massachusetts.

A distinguished citizen and jurist, whose gift of judicial penetration goes hand in hand with that of the high-minded executive and of the wise counsellor, he belongs to that honored group of men, who have placed the Commonwealth under debt to Berkshire County. Berkshire's College now bestows on him the neighborly recognition of name and power already achieved.

Such honors and such citations are not only the priceless possessions of the recipient, but they proclaim to the world the high regard which his life and his character had won. The facts amply warranted such commendations.

In the course of his career upon the bench of this court Judge Crosby wrote nearly fourteen hundred opinions. It is difficult indeed to even estimate the hours of patient listening, the long consideration and analysis of records and briefs, the deep research in the books and the careful selection of apt words which these opinions represent. His opinions never bordered on the spectacular, but in them are found that immense fund of sound common sense and wisdom which was an attribute of his entire career. Undoubtedly, from the purely layman's point of view, the opinion most widely read and discussed was Judge Crosby's opinion in *Commonwealth* v. *Millen*, 289 Mass. 441. The Millen brothers and one Faber, in attempting to rob the Needham Trust Company in Needham, shot and killed a police officer in that town. Judge Crosby's opinion covers a little more than forty pages, but it is a monument to his industry in considering every point raised by the defendants and his analysis of decided cases in this and other jurisdictions, including decisions by the Supreme Court of the United States. It is a reservoir of great worth to those engaged in the practice of criminal law, especially in murder cases.

In *Lowell Co-operative Bank* v. *Co-operative Central Bank*, 287 Mass. 338, constitutional questions of importance, both Federal and State, were involved, and Judge Crosby restated in terms not to be misunderstood that our Supreme Judicial Court "is concerned only with the power of the Legislature to enact laws, the question of their expediency or the policy behind it being matters purely within the legislative discretion."

While Judge Crosby was one of the friendliest of men and one who never carried a chip on his shoulder, nevertheless when his mind was made up nothing could change it as several dissenting opinions attest. Twice in 1918 — *Friend* v. *Childs Dining Hall Co.* 231 Mass. 65, and *Ward* v. *Great Atlantic & Pacific Tea Co.* 231 Mass. 90, and once in 1921, *Loring* v. *Young*, 239 Mass. 349, Judge Crosby wrote strong dissenting opinions — opinions which to many seemed persuasive — where the majority opinions had been written by Chief Justice Rugg. These opinions showed profound thought and wide research in the books both English and American.

One of Judge Crosby's opinions is always quoted and will continue to be quoted wherever there is a dispute between lawyer and client as to fees. I refer to *Cummings* v. *National Shawmut Bank*, 284 Mass. 563. His statement as to the pertinent considerations in determining how fair and reasonable charges are to be determined embodied no new principles of law, but the rule laid down was so concise, so understandable and so workable that it is classic.

Judge Crosby enjoyed men and he possessed a rare sense of humor. I ran across an interesting tradition in Berkshire County some years ago. In a period when Pittsfield was arid by vote of its citizens, a group of congenial souls organized a club where kindred spirits gathered once or twice a month for a good dinner, good jokes and good companionship. At that time golf was just being introduced in the United States and Judge Crosby and his friends adopted for their informal club the name of Pittsfield Golf Club and thus it has been known even to this day. It had no greens, no fairway, no clubs, no balls. Its sole real estate

was a rented room in a warehouse next to the railroad tracks. But its hospitality, which I myself have enjoyed, was limitless. I can conjure easily the twinkle in Judge Crosby's eyes when he proposed the adoption of the name, "Pittsfield Golf Club."

Judge Crosby was of Scotch-Irish descent, his grandfather having been born in Dublin while his mother's parents were both born in Scotland. Judge Crosby's wife is a lineal descendant of Elder William Brewster.

In his death Massachusetts has lost a splendid citizen and a courteous, just and highly capable Judge. He well deserves the encomiums spoken in today's memorials.

James Fallon, Esquire, addressed the court as follows:

May it please your Honors: It is not my intention to describe the judicial accomplishments of the late Associate Justice of this Honorable Court, John Crawford Crosby. That is the privilege of those who are more familiar with his judicial qualifications and accomplishments than am I.

I desire, however, to refer briefly to his career and characteristics as a generous, civic-minded citizen; a faithful public servant; an able, painstaking, conscientious lawyer; and a true friend of humanity.

After completing his basic education, he became a student in the office of Marshall Wilcox, of Pittsfield. Marshall Wilcox was an eminent member of the Berkshire Bar. He revered the law; in fact he regarded it as a science; and, while he lived, he remained a diligent student of that, which to him was a science. Before rendering an opinion or undertaking litigation, he exhausted all the known authorities. He was an exacting taskmaster and imbued his students with a reverence for the law and a devotion thereto akin to his own reverence and devotion. These lessons of devotion to the law, fidelity to clients, and proper preparation for the trial of causes, which the young Mr. Crosby learned in that office, he never forgot; nor did he ever fail to employ them.

Later, Mr. Crosby was graduated at the law school of

Boston University; and in the year of Our Lord 1882, he was admitted to practice in the courts of this Commonwealth.

Nature was very kind to John Crawford Crosby. In face and form, he was a handsome man, tall of stature and commanding in appearance. He was a formidable opponent in political contests and in the trial of causes. His powerful physique and his ingratiating smile created a favorable impression upon all with whom he came in contact.

It is true that this impression would have been of little avail had he not possessed a high degree of intellectual ability, a keen sense of humor, untiring diligence, the power of logical argument, and an adroit method of appealing to common sense; nevertheless this impression did assist in paving his way to eminence at the Bar and to his position on the Bench.

Early in his career, his popularity ushered him into civic life. In the years 1886 and 1887, he served in the Massachusetts House of Representatives. In the years 1888 and 1889, he served in the Senate of this Commonwealth. Later he served in the House of Representatives of the Fifty-Second Congress of the United States. In the years 1894 and 1895, he served as mayor of the city of Pittsfield, and for many years thereafter he served that city as its city solicitor; and from 1884 to 1890, inclusive, he served as a school committeeman of the town of Pittsfield.

His knowledge of the process and progress of legislation was extensive — in fact, well nigh comprehensive. To listen to his recital of the handicaps that inexperience placed upon the legislator and the hurdles that were placed in the path of the extremely independent legislator was equivalent to an intensive course in political science.

Early in his career at the Bar, he became a member of the law firm of Crosby and Noxon, which firm for many years was one of the prominent law firms of the county of Berkshire. In the year 1905, after many successful years in the practice of law, he was appointed to the position of Associate Justice of our Superior Court; and in the year 1913, he was elevated to membership in this Honorable Court.

Prior to his appointment to the Superior Court Bench, Berkshire County needed a resident Justice. The demand for such a Justice was intense and persistent. For appointment to the judiciary, Mr. Crosby favored his law partner, the late John F. Noxon, whom he was accustomed to describe as his law library. Circumstances, however, rendered it necessary for Mr. Crosby to accept the position; and, yielding to the persuasions of the members of the Berkshire Bar, he accepted the appointment, because he regarded acceptance as his duty to his fellow members of that Bar.

Judge Crosby sincerely believed in the Brotherhood of Man. Like Bobby Burns, he believed that "the rank is but the guinea's stamp, the man's the gowd for a' that." Like Burns, he was suspicious of the "unco guid"; any assertion of self-righteousness, any exhibition of arrogance, any semblance of hypocrisy aroused his contempt, and they appear to have been the only things of which he was contemptuous.

In religion, he was liberal. He claimed the right to attend the church of his choice; he conceded the same right to all others; and to those whose convictions impelled them to remain away from all churches, he conceded their right so to do.

One of the illustrations of his liberality, in religious matters, is the story which he told regarding Konkapot, a Chief of the Stockbridge Indians, who had been converted to Christianity. The clergyman who converted him advised him to pray to God for that which he desired most, and Konkapot is alleged to have prayed thusly: — "Oh! God, be kind to Konkapot. If you were Konkapot and Konkapot were God, Konkapot would be kind to you"; and Judge Crosby would add, "I wonder whether the old Chief wasn't teaching some genuine Christianity to the man who sought to teach it to him." That which appealed to Judge Crosby was the kindness for which the Chief prayed.

Kindness was one of his outstanding characteristics. He was particularly kind, generous and helpful to the younger members of the Bar. He was never too busy to talk with

them about matters in which they were interested. He was always willing to assist them in solving their legal problems. He advised them to learn the rigid rules of practice, but to refrain from relying upon those rules. He advised them that the trial of causes should be a proceeding to learn the truth and to establish justice, and not a game to be won or lost by rigid rules.

In his campaign for Congress, one of the older members of the Bar described him as the Blue-eyed Son of the Housatonic Valley. He appeared to like the name. He was fond of the Valley, fond of the hills that border it, of the river that flows through it, of its lore, its legends, its authentic history and of the people who inhabit it.

I believe that if Judge Crosby were to select the tribute that would be most pleasing to him, he would, like Abou Ben Adhem, merely ask to be written down as one who loved his fellow man; and, although the members of the Berkshire Bar are proud of his attainments, his achievements, and his judicial qualifications and accomplishments, we prefer to remember him as a companionable member of the Bar, an intensely civic-minded citizen, a kind, generous and helpful neighbor, and a true friend of mankind, and we know that the people of Berkshire County will so remember him.

CHIEF JUSTICE FIELD responded as follows:

Mr. Attorney General and Brethren of the Bar: The court unites with the bar of the Commonwealth in tributes of respect and affection to John Crawford Crosby, late Associate Justice of this court. He resigned as Associate Justice on October 1, 1937, after a devoted service to the Commonwealth in this judicial position of nearly twenty-four years, having been appointed December 31, 1913. He lived in well earned retirement until his death on October 14, 1943, in the eighty-fifth year of his age. Of the seventy-five justices of the court since the adoption of the Constitution in 1780, only eight, among them Chief Justices Shaw, Knowlton and Rugg, have been members of the

court for a longer period than Judge Crosby. Before his appointment to this court, he was an Associate Justice of the Superior Court. His aggregate period of service on the two courts was between thirty-two and thirty-three years. No other justice, except Judges Wilde, Braley and Pierce, had so long a period of service upon these courts. While Judge Crosby's service upon the Supreme Judicial Court furnishes the primary reason for today's exercises, his other public services are not to be disregarded. Moreover, none of us who knew him can forget the personal qualities that endeared him to us.

Judge Crosby was born in Sheffield, in the county of Berkshire, on June 15, 1859. His father was a deputy sheriff, and later was sheriff of that county for nine years. Judge Crosby continued throughout his life to be a resident of the county — for most of his life, of the town and the city of Pittsfield. He was a loyal son of Berkshire, and the people of Berkshire reciprocated by their loyal friendship to him and pride in his accomplishments. In the performance of his judicial duties, however, he served the entire Commonwealth and in such performance his "sword knew no brother." No man could have had a higher standard of impartiality. The Supreme Judicial Court sits most of the time in Boston. The travelling required of Judge Crosby to attend these sessions was greater than that required of any of his colleagues. But the burden of travelling did not cause him to change his residence from Pittsfield although he frequently stayed in Boston for several weeks during the winter months. He felt amply compensated for the additional burden of travelling by the joy of returning to his home in Pittsfield amid his native hills.

Judge Crosby attended the public schools of Berkshire County and the Eastman Business College at Poughkeepsie, New York, and began the study of law in the office in Pittsfield of the late Marshall Wilcox. He continued his professional studies in the law school of Boston University, graduating in 1882 with the degree of Bachelor of Laws. That university later conferred upon him the degree of Doctor of Laws, as also did Williams College. In the year

of his graduation from law school he was admitted to the bar and began the practice of his profession in the office of United States Senator Henry L. Dawes. Some years later he formed a partnership with John F. Noxon which continued until his appointment as Associate Justice of the Superior Court. This firm had a large general practice including much trial work in which Judge Crosby participated actively with a high degree of success. It is said that he and his partner tried more than half of the cases in the civil sessions of the Superior Court for the county. He had a strong consciousness of his responsibility to those who chose him for their counsel or advocate. He was assiduous in his attention to their affairs. His working days were long.

Judge Crosby was interested in the business life of the community and had the confidence of its business men so that two important financial institutions elected him to their boards of directors.

Soon after his admission to the bar Judge Crosby became active in public affairs. He was a member of the school committee of Pittsfield from 1884 to 1890, of the Massachusetts House of Representatives in 1886 and 1887, and of the Massachusetts Senate in 1888 and 1889. In 1889 the statute was passed for the incorporation of the city of Pittsfield. In 1890 Judge Crosby was elected a Representative to the Fifty-second Congress of the United States from what was then the Twelfth Massachusetts District consisting of the towns in the county of Berkshire, the city of Springfield, and various towns in the county of Hampden. Following a redistricting in 1892, he was a candidate for election as Representative to the Fifty-third Congress from what had become the First Massachusetts District, with some changes from the previous Twelfth Massachusetts District, but was defeated by a very small margin of votes. For several years he was city solicitor of Pittsfield, and in 1894 and 1895 he was mayor of the city. In 1900 he was the unsuccessful Democratic candidate for Attorney General, and in 1904 for Lieutenant-Governor.

On January 25, 1905, Judge Crosby was appointed an

Associate Justice of the Superior Court. With a high sense of judicial propriety he thereafter refrained from political activity and even from the public expression of his views upon controversial political subjects. Whether he expressed his views upon such subjects privately, only his most intimate associates would know. Judge Crosby's large experience in the trial of cases had given him great familiarity with the work of the Superior Court in which he was to share. He carried into this work the qualities that had marked his career as a lawyer. He gave the same assiduous attention to the performance of his judicial duties that as a lawyer he had given to the service of his clients. He continued to be friendly in his relations with lawyers but would permit no advantage to be taken of his friendliness. He was courteous to all who came before him. He presided with quiet dignity which insured decorum in the court room and orderly proceedings. He maintained his authority without display. He listened patiently, considered carefully, and ruled fairly and firmly. Lawyers liked to try before him. He was in no sense a specialist, but sat in all types of cases within the broad jurisdiction of the court. However, with another judge or alone, he presided in a number of capital cases.

After a service of slightly more than eight years on the Superior Court, Judge Crosby was appointed an Associate Justice of the Supreme Judicial Court. A part of his work as such justice consisted of presiding in the single justice session of the court. This work is closely similar to the work, other than sitting with juries, of a judge of the Superior Court. As a single justice Judge Crosby showed the qualities that had characterized his work in the Superior Court.

The major part of the work of a justice of the Supreme Judicial Court is participation in the work of the full court. Judge Crosby first sat with the full court on January 12, 1914. His first opinion, expressing the opinion of the court, was in the case of Bennett v. Jordan Marsh Co. 216 Mass. 550, decided February 26, 1914. Beginning with that opinion he spoke for the court in thirteen hundred sixty-

three opinions. His last such opinion was in the case of *A. G. Walton & Co. Inc.* v. *Levenson,* 298 Mass. 407, decided September 24, 1937. His opinions touched almost every field of the law within the jurisdiction of the court. Many of them dealt with questions of more than ordinary importance. It would be difficult to select his most important opinions. An attempt at such a selection would rightly be subject to the criticism that opinions of equal or greater importance were omitted. Such a selection, if attempted, would naturally include the opinion in the case of *Lowell Co-operative Bank* v. *Co-operative Central Bank,* 287 Mass. 338, where the statute providing for a fund for the insurance of shares in coöperative banks was held to be constitutional; the opinion in *Commonwealth* v. *Millen,* 289 Mass. 441, a capital case involving many questions of criminal law, some of them constitutional questions; and the opinion in *Guinan* v. *Famous Players-Lasky Corp.* 267 Mass. 501, a case involving the liability of a distributor of motion picture films for personal injuries resulting from the explosion of scrap film when being transported. Apart from joining with other justices in several dissenting opinions, Judge Crosby wrote only three dissenting opinions. In *Loring* v. *Young,* 239 Mass. 349, Judges DeCourcy and Crosby, each in a separate opinion, dissented from the conclusion of a majority of the court that the "Rearrangement of the Constitution," submitted to the vote of the people in 1919, did not by reason of such vote become the Constitution of the Commonwealth. He also dissented in *Friend* v. *Childs Dining Hall Co.* 231 Mass. 65, and in *Ward* v. *Great Atlantic & Pacific Tea Co.* 231 Mass. 90.

Judge Crosby wrote his full share of opinions expressing the views of the court. He was industrious to a marked degree. When free from assignments to sit as a single justice or on the full court, he spent much time in his study at his home in Pittsfield and at the court house in Boston in the preparation of his opinions.

From the beginning of his service on the court, Judge Crosby's written opinions were excellent in form. They were expressed in clear language without attempt at orna-

mentation. They were arranged in orderly fashion, proceeding logically from an accurate and adequate statement of the evidence or facts involved to the conclusion deemed to be required by the law. He was not given, however, to the discussion of principles of law at large, but confined himself to dealing with those principles so far as they were necessarily involved in the decision of the particular case. Even in dealing with principles of law so involved, he was not inclined to state them in general terms, and he rarely, if ever, indulged in dicta. Judge Crosby relied heavily upon authority, particularly the authority of cases decided by this court, and he was little disposed to question the soundness of such cases or to favor overruling them. And he was unusually accurate in the selection for citation of authorities pertinent to the specific points under consideration. Judge Crosby's varied experience in affairs, including experience in legislation and administration, contributed to sound judgment in the application of principles of law to evidence and facts.

Judge Crosby was intensely devoted to the court as an instrument for the administration of justice. He respected its traditions and was jealous of its reputation. He was anxious and strove earnestly for the maintenance of its standards. He held in particularly high regard the man who was Chief Justice of the court during the entire period of his service thereon. The work of the court naturally brings the justices into intimate personal relations. Judge Crosby was friendly with his associates and unselfishly considerate of them. He was an agreeable companion and co-worker. The necessity of travelling from the western part of the State to attend sessions of the court in Boston brought Judge Crosby into specially close relations with Judge Carroll with whom he frequently travelled, and he felt keenly the death of Judge Carroll several years before his own retirement. Justices appointed to the court after Judge Crosby had served thereon for many years found him a kindly senior, free from assertion of superiority by reason of seniority or long experience. And his kindly attitude extended to members of the staff of the court who worked for him.

Judge Crosby's dignity of appearance and manner, when on the bench, did not conceal his friendliness. And it did not wholly conceal his sense of humor, which he displayed in moments of relaxation. He liked people and enjoyed the society of his friends when the burden of his work permitted. It was the custom of Judge and Mrs. Crosby for many years to entertain at dinner in their attractive home in Pittsfield the justices who were attending the session of the full court for the county. This gracious hospitality, and the chance afforded for a delightful view from the Crosby residence of the surrounding Berkshire hills, will long be remembered. Judge Crosby took great satisfaction in this home and in the farm that he maintained. For many years he was accustomed to ride horseback around the adjacent countryside. He had the habit — frequently attributed to judges — of reading detective stories, and often exchanged with Judge Carroll, who had the same habit, information as to the latest "thriller." Moreover, he was fond of and very familiar with the works of Dickens. With Mr. Pickwick he seemed to have almost a speaking acquaintance. Judge Crosby enjoyed travel for recreation, but he had little time for gratification of this taste. Occasionally, however, he had such an opportunity. One such occasion was in 1924, when he visited England and France with the American Bar Association. Judge Crosby was interested in everything that concerned the city of Pittsfield, its civic and business affairs, its charitable institutions, and the welfare of its individual citizens. He was a good citizen and a good neighbor. He was a devoted husband, son and brother — a devotion that was returned in full measure — and he had a generous interest in persons more remotely connected with him by kinship or long association. He had the spirit of helpfulness and manifested it by his works, with respect to which, however, he was reticent. The many and varied responsibilities of life, of which he was keenly aware, he faced seriously and with a smile.

The motion that the Memorial be spread upon the records of the court is granted.

The court will now adjourn.